## HENDERSON v. STATE.

No. A-11293. April 18, 1951.

(230 P. 2d 495.)

Harry Seaton, Public Defender, and Amos T. Hall, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, P. J. The plaintiff in error, Inzion Henderson, defendant below, was charged by information in the district court of Tulsa county, Oklahoma, with the crime of rape in the first degree, allegedly committed on the night of September 16, 1948, on the outskirts of Tulsa. The information in substance alleged that the crime was committed upon the person of Mrs. Eleanor Nelson by means of force and fear, the defendant threatening to kill Mrs. Nelson and thus overcoming all resistance on the part of the said victim. He was tried by a jury, convicted, and his punishment fixed at death. Thereafter, judgment and sentence was entered accordingly.

The defendant raises but one point on his appeal, that is, that the identification of him is not beyond doubt. The evidence in relation thereto is as follows, in substance: The victim, Mrs. Nelson, is married and the mother of 3 children.

Her youngest child at the time the alleged rape was committed was about 3 months old. Mrs. Nelson testified that on the night of September 16, 1948, she went to a friend's home for the purpose of organizing a quartet. About 10 o'clock she left the meeting place in her automobile to return home. At the northeast corner of Peoria and Pine there is a filling station. When she reached the intersecting corner of Peoria and Pine traveling west she stopped for the stoplight. As the light changed Mrs. Nelson started forward and the defendant, who was leaning against a gasoline pump, informed her she had a flat rear tire. Mrs. Nelson testified she pulled across the street out of the traffic and stopped. She testified further she got out of her car on the right-hand side and went around the back and found no flat tire. She got back into her car and was leaning over from the wheel to close the door when some one pulled the door open and the defendant, a colored man, got into the car beside her. The man had a banana knife in his right hand and said "drive around like I tell you and you won't get hurt". At the trial Mrs. Nelson pointed out the defendant as the same man who was leaning up against the gasoline pump as she passed. She testified he got in the middle of the front seat and with his left arm on her shoulder across the back seat and the knife in her right side. He admonished her again "drive on and you won't get hurt". Mrs. Nelson drove on as he directed her to the first intersection, when he directed her to turn right, after which she drove eight blocks north on Norfolk street. During this time he leaned over and kissed her on the right cheek. She continued to drive as he directed until they came to a dirt road angling off to the northeast. The defendant then forced Mrs. Nelson to get in the back seat and he drove a little while. Finally he parked the car and got in the back seat with Mrs. Nelson. Then, after preliminary maneuvers, he required her to take off her belt and panties. Then, she testified, he unbuttoned his pants, pushed her back on the seat and had sexual intercourse with her. She testified there was full penetration. After the rape Mrs. Nelson said he talked to her for about five minutes. He asked her if she would know him if she saw him again. To which she responded, "I don't think so". To which he replied, "Yes, you would too". Mrs. Nelson's retort was "I haven't had a very good look at you, with your hat pulled down over your face". The party who raped her, she said, asked "Who all are you going to tell about this". She told him "I guess I will tell my husband". To which he replied, "Yes, you would too". you in trouble." The defendant, she said, then asked her for her driver's license, and she told him she had none. He then took her purse and removed some of its contents such as postcards and her garbage bill. Mrs. Nelson said the defendant held the garbage bill up to the light of the moon and read it. He asked her if she lived at 1635 Elwood. When her answer was in the affirmative he put the garbage bill in his shirt pocket, and said, "If you talk, I will send my boys around to see you". Mrs. Nelson said the defendant asked if she had money, and she told him, $10. He wanted to know the size of her family and if they were people of wealth. Her answer was in the negative. She said the defendant did not take her money. The conversation after the rape lasted for about five minutes, or a little longer. Mrs. Nelson further testified the defendant got out of the car, but she remained inside. She said the defendant wiped the fingerprints off the door, and steering wheel, dashboard, the window panes, and the back part of the back seat. Thereafter Mrs. Nelson said she got in the front seat, under the wheel and the defendant got in the seat beside her. He told her to swing the car around and start driving back. When they got within a half block of Peoria, Mrs. Nelson was directed to stop again. He put one foot out of the car, and handed Mrs. Nelson his handkerchief and told her to wipe off her purse and the cards and things in her purse, which she did. All the time he was there with his knife on her. Then the defendant tied his handkerchief over his face and shut the door, and Mrs. Nelson said she drove as fast as she could. She was

confused about directions and drove out of town, then she turned around and drove back, got her bearings and went home. The first person Mrs. Nelson talked to after she got home, she said, was her husband. She said the defendant's voice was different to most colored people's voice, it was soft and educated. The next time she saw the defendant was some time in December, 1948, in a police line-up. She identified the defendant then, she said, and was positive that he was the man who raped her. On cross-examination, Mrs. Nelson said her look at the defendant at Peoria and Pine was just a fleeting glance, she had never seen the defendant before. She said she was impressed when the defendant told her she had a flat, because the week before she had two flats on her rear tires. She admitted she didn't see the defendant until he got in the car beside her. Mrs. Nelson described the man's dress as a shirt and pants and said she didn't notice them especially. But she stated the defendant did have on a real dark brown hat pulled down over his eyes. She did not know the color of his shirt except it was khaki or darker. When asked if she took a good look at him, she stated she saw his lips, as well as the line of his jaw and neck and shoulders and things like that, when he reached over and kissed her. (She was kissed on the cheek, she testified.) She did not look at him, she said, when they were driving around. When they stopped she said she didn't stare at him, she was too scared, but she stated she saw his lips. But she testified that she did see his eyes when he talked to her in the back seat. (The state had offered the knife in evidence taken from the defendant's overcoat, when he dropped the coat, while in flight, after being shot at by Officer Alexander.) She identified the knife positively in her evidence in chief. She stated on cross-examination that she observed no identification marks on the knife, but that the one in evidence was either the same knife or one just like it. She was certain it was a banana knife. She stated he held the knife in his right hand all the time. She testified the defendant used good English all the time. The foregoing in substance constitutes the state's case as to the commission of the crime; and all the evidence as to identification.

Art Nelson, the victim's husband, testified that he was at home when his wife came into the room in hysterics, fell down on the bed crying, and in a nervous rigor. Finally he got her calmed down enough to get her to tell him what was the matter. He said she told him a Negro man raped her.

Opal White testified that on the night of December 4th she saw the defendant Henderson between Iroquois and Kensoha streets, with a knife just like the one involved in this case. On cross-examination she didn't know if that was the same knife but it looked just like it. On recross-examination by the defendant she testified that he "put the knife on her", that he had it around her neck and throat. On redirect examination by the state, she testified he cut her in the corner of her mouth and on her neck, on the hand, and chin. It was a banana knife. She positively identified Henderson in the courtroom. It was competent for Opal White to identify the knife as belonging to the defendant, but evidence of other offenses was clearly inadmissible. Williams v. State, 68 Okla. Cr. 348, 98 P. 2d 937; Landon v. State, 77 Okla. Cr. 190, 140 P. 2d 242; Quinn v. State, 54 Okla. Cr. 179, 16 P. 2d 591, and numerous other cases. This evidence in relation to assault upon Opal White was highly prejudicial to the defendant, and though brought out by defendant on cross-examination was avidly pursued in amplification by the county attorney in redirect examination. Certainly, had this evidence been objected to, the trial court would no doubt have sustained the objection thereto. And, even though no objection to the injection of this other crime was interposed, this court cannot overlook the fact of its prejudicial nature. Undoubtedly, it was persuasive on the jury in fixing the death penalty. We cannot overlook the fact that

without it, the jury might not have imposed the extreme penalty. In any event, it must be considered as supporting the proposition of identification.

Officer Joseph Alexander testified that on the night of December 4, 1948, he was an officer in the colored section of Tulsa, Oklahoma. That he had occasion to be looking for the defendant Henderson; observed him at Lattimer Court and Greenwood. He pursued the defendant, shot at him, missed him but hit his overcoat, which was removed and thrown to the ground. His hat also fell off. When Officer Alexander picked up the overcoat a banana knife fell out of the lining of it. His identification of the defendant was positive as to this occasion. Later, after his arrest, the defendant admitted the knife belonged to him.

A demurrer was interposed by the defendant, and overruled by the trial court.

The defendant testified for himself. He said he was 25 years of age and married. He denied the commission of the alleged crime, and stated the first time he ever saw Mrs. Nelson was on December 6 after his apprehension and arrest. He further swore that on September 16, 1948, he was at Marvin's house playing cards. He heard Marvin had moved to Bristow and though he attempted to get in touch with him he was not able to do so. He denied ever having sexual intercourse with Mrs. Nelson at any time. He admitted that he had theretofore been convicted of attempted rape and was then doing time in McAlester for the crime. He further stated he was and had been willing at all times to take the truth serum and lie detector tests and be bound by the results thereof, and that he did take the tests. The record shows in this regard that though objection was interposed and sustained, nevertheless it was not stricken from the jury's consideration. The record in regard thereto is as follows:

"Q. Are you willing at this time and have you been willing at all times to submit to the lie detector and the truth serum and be guided by any results that they may have? A. I am. Mr. Devine: Just a minute. A. I am. Mr. Devine: Wait a minute, I object as incompetent, irrelevant and immaterial, as to what kind of tests he wants to take. The Court: Objection sustained. Q. (By Mr. Seaton) Are you willing at this time— Mr. Devine: The same objection. Mr. Seaton: Now, may I propound my question? The Court: Just finish your question. Q. (By Mr. Seaton) Are you willing at this time to be given a lie detector test or truth serum and be guided and enter a plea under the lie detector or truth serum, if it is negative and shows you were guilty of this crime? Mr. Devine: Just a minute, if the court please— The Court: Objection sustained. Mr. Seaton: Exception to both. A. Let me—Your Honor, may— The Court: Now wait a minute, don't talk. If you want to argue you talk to your lawyer about it. Mr. Seaton: Give us an exception in both cases. The Court: Yes. If there is some question you want to talk to your lawyer about it, don't just talk, unless you are answering some question. Q. (By Mr. Seaton) Were you on the intersection of Pine and Peoria on the 16th day of September, 1948? A. I was not. Mr. Seaton: You may inquire. The Court: Excuse me. I might suggest, since the witness apparently had something he wanted to say to me, that you see Mr. Seaton what, if anything, he might want to suggest to you. Do it in the absence of the jury though. Q. (By Mr. Seaton) While you were at the police station, after your arrest in this case, was the lie detector and the truth serum administered to you? Mr. Devine: Object to that as immaterial. A. Yes sir. Mr. Devine: Wait a minute. The Court: Now, please don't answer these questions until opposing counsel has a chance to object and until I rule on it. After I rule on it, that means you can answer. A. I am sorry, sir. Mr. Devine: We object to that as incompetent, irrelevant and immaterial. The Court: Objection sustained."

He testified his education stopped at the 7th grade, and he could not read well enough to read an ordinary newspaper. On cross-examination he said he

did not know Marvin's last name, but Benny Coleman and his wife were there playing cards at the same time. Benny he said was in Kansas City, but Benny's wife was in Tulsa. He stated he requested no subpoena for either of them. He said no one other than himself was in the show-up. He admitted he owned the banana knife on September 16, 1948, and that it was on him when Officer Alexander shot at him. Moreover, he admitted he was tried for attempted rape on Opal White, convicted, and sentenced to seven years in the penitentiary. He testified that Mrs. Nelson had identified another Negro by the name of William Frame as her assailant. It was brought out that this was hearsay. He admitted that he assaulted Opal White with the banana knife on December 4, 1948, but objection was made to this on the ground of incompetency and the objection sustained. No motion to strike was made and thus the record stood. He admitted he had been in the filling station at Peoria and Pine streets in Tulsa.

Ada Lee Henderson, the defendant's wife, testified that she and the defendant had been married about seven years. She identified the knife as belonging to them. She said it was usually kept in a box under their bed, but on September 16th it was on the table because she had used it, and that it was there on the night of September 16th. On cross-examination she testified they had the knife for three or four years. She said she peeled potatoes with the knife on September 16th. She saw it again on October 28, 1948, and all the time in between. She could give no reason for singling out the 28th as the day she saw the knife the second time but stated she saw it on the table. (It is of weight to note that no attempt was made to have her testify as to the card game at Marvin's on the night of September 16, 1948.) Here the defendant rested his case, without any attempt to corroborate his alibi either by his wife or by Mrs. Coleman, both of whom he said were at Marvin's on the night of the crime.

In rebuttal for the state Officer Stege testified there were five other colored prisoners in the show-up besides the defendant when Mrs. Nelson identified him. In this he was corroborated in further rebuttal by Mrs. Beulah Johnson, policewoman, who testified that Mrs. Nelson picked out the defendant. Officer Stege stated that he had a conversation with defendant's wife about the 7th of December and she denied ever having seen the knife before. Mrs. Henderson, defendant's wife, was next called to the stand and admitted she so informed him. Thus she cast doubt on the truthfulness of her testimony in behalf of her husband in regard to the banana knife.

Thereafter the court instructed the jury without objection on the part of either the state or the defendant. We have carefully examined the instructions and find them to be fair to both parties. The jury then returned its verdict of guilty and fixed the punishment at death.

On a motion for new trial on the ground of newly discovered evidence, the defendant complained that he was without investigative aid in preparation for trial. This contention does not come within the scope of newly discovered evidence. Nevertheless, he offered evidence he was thus unable to locate Marvin, and other local witnesses in Sapulpa and Bristow upon whom he was dependent, we take it, to establish his alibi that at the time the crime was committed he was playing cards with said parties. But even this contention loses its substance when measured by the defendant's failure to interrogate his wife in relation to the card game at Marvin's, or any attempt to offer Mrs. Coleman who was allegedly living in Tulsa. Hence, we can hardly be justified in sustaining this contention on any basis, much less as newly discovered evidence, when the defendant didn't use such evidence as he had available in this regard. Surely if such had been true Mrs. Henderson would have been asked concerning their whereabouts on the night of September 16, 1948, but she was not. Here, there appears a total lack of diligence not only to procure but to produce this evidence.

In the first place all· this evidence could by the exercise of due diligence have been procured before trial, and where such is the case, the failure so to do constitutes a bar to a new trial on such alleged ground. Devore v. State, 33 Okla. Cr. 403, 243 P. 999; McColloch v. State, 45 Okla. Cr. 442, 283 P. 1026; Beaver v. State, 54 Okla. Cr. 49, 14 P. 2d 423; Isom v. State, 55 Okla. Cr. 173, 26 P. 2d 952; Smith v. State, 78 Okla. Cr. 343, 148 P. 2d 206. Nor does the motion on this ground of newly discovered evidence meet the requirements of Title 22, § 952, O. S. A. 1941, for the motion did not set out the diligence used on the part of his counsel, nor did it set out the evidence of the witnesses, all as required by law. McKenzie v. State, 34 Okla. Cr. 233, 245 P. 1005. Under these conditions most all the foregoing cases, and others too numerous to cite, hold, it is not an abuse of discretion to deny a motion for new trial on such ground.

Next the defendant's motion for new trial relates to the facts surrounding both a lie detector test and truth serum test and the negative results thereof. He urges he should have been permitted to show the voluntary taking of such tests by the defendant, and that their results were negative.

In this connection, the record in chief discloses that counsel for the defendant made a persistent effort to get this evidence in the record. Hence this could hardly be regarded as newly discovered evidence, but nevertheless exception was saved to the sustaining of the state's objection to the defendant's attempt to show the negative results of these tests, and the question is properly preserved in the record. Moreover, the question is supplemented by the motion for new trial on the grounds of newly discovered evidence, and the evidence offered in support thereof, the question is sufficiently raised to command our attention. It is apparently one of first impression in this jurisdiction. Hence we have made an extensive search for authority upon which to determine the correctness of the trial court's ruling in rejecting the defendant's attempt to show that lie detector and truth serum tests were made and were negative. Notwithstanding various lie detector tests have been experimented with for more than 50 years, there is a dearth of reported cases dealing with the admissibility of this type of evidence. The first attempt to utilize a scientific instrument for detection of deception was in about 1895. These experiments were conducted by Ceasar Lombroso. Such instruments as are in use today contain one or more of the following devices:

" * * * (1) a cardiograph, which registers the pulse rate, (2) a sphygomograph, which records the blood pressure, (3) a pneumograph, which records the respiration, and (4) a galvanograph, which registers the galvanic reflect or electrodermal response.

"The theory of the machine is founded on the results of discoveries made by numerous persons over a considerable number of years that, when there is an attempt to deceive, in most instances the blood pressure of the subject increases, his pulse rate changes, his breathing is apt to be shallow and suppressed, and fluctuations occur in his electrical resistance, revealed by activity of the sweat glands. The polygraph records on a moving strip of paper, driven by a small motor, the various changes which occur while the subject is undergoing questioning."

Topical Law Reports 1947-48, p. 3010, The Detection of Deception—A Resume. We know of only one case in the reports where lie detector evidence was permitted to be introduced. That was in the case of People v. Kenny, 167 Misc. 51, 3 N. Y. S. 2d 348, 350. In that case the defendant was on trial for robbery, and having submitted to a lie detector test, offered the findings of the examiner in evidence. It appears that the Queens County Court was impressed with the operator's statement that the results of its use "indicated 100 per cent. accuracy".

That statement as to accuracy of the lie detector is not even now contended for by the most enthusiastic advocates of its efficacy. Though reported this case was never carried to the New York Court of Appeals. Nevertheless, in principle it was repudiated in People v. Forte, 167 Misc. 868, 4 N. Y. S. 2d 913, which contains an extensive discourse on the use of such instruments and the reasons for its inadmissibility, and therein an appeal was taken to the Court of Appeals. 279 N. Y. 204, 18 N. E. 2d 31, 32, 119 A. L. R. 1198. Therefore, People v. Kenny must be considered in the light of People v. Forte, supra, the Court of Appeals said:

"Can it be depended upon to operate with complete success on persons of varying emotional stability? The record is devoid of evidence tending to show a general scientific recognition that the pathometer possesses efficacy."

In this connection topical Law Reports, No. 4-7-3011, digesting an article appearing in 8 Fed. Bar Journal, January 1947, 153-171, said:

"It is true that the figures show that the tests have proved correct in their diagnoses in about 75% of the instances used, * *."

No doubt this is one of the reasons why the lie detector is not judicially recognized. In a comparatively recent work "Lie Detection and Criminal Investigation" now in its second edition, by Fred E. Inbau, Professor of Law, Northwestern University and formerly Director of the Chicago Police Scientific Crime Detection Laboratory, there are listed the factors responsible for the 25% failures. They are as follows:

"The factors which occasion the chief difficulties in the diagnosis of deception by the lie-detector technique may be enumerated as follows:

"(1) Emotional tension—, 'nervousness'—experienced by a subject who is innocent and telling the truth regarding the offense in question, but who is nevertheless affected by
  (a) fear induced by the mere fact that suspicion or accusation has been directed against him, and particularly so in instances where the subject has been extensively interrogated or perhaps physically abused by investigators prior to the time of the interview and testing by the lie-detector examiner; and
  (b) a guilt complex involving another offense of which he is guilty.

"(2) Physiological abnormalities, such as
  (a) excessively high or excessively low blood pressure;
  (b) diseases of the heart;
  (c) respiratory disorders, etc.

"(3) Mental abnormalities, such as
  (a) feeblemindedness, as in idiots, imbeciles, and morons;
  (b) psychoses or insanities, as in manic depressives, paranoids, schizophrenics, paretics, etc.;
  (c) psychoneuroses, and psychopathia, as among so-called 'peculiar' or 'emotionally unstable' persons—those who are neither psychotic nor normal, and who form the borderline between these two groups.

"(4) Unresponsiveness in a lying or guilty subject, because of
  (a) lack of fear of detection;
  (b) apparent ability to consciously control responses by means of certain mental sets or attitudes;
  (c) a condition of "sub-shock" or 'adrenal exhaustion' at the time of the test;
  (d) rationalization of the crime in advance of the test to such an extent that lying about the offense arouses little or no emotional disturbance;
  (e) extensive interrogation prior to the test.

"(5) Unobserved muscular movements which produce ambiguities or misleading indications in the blood pressure tracing."

Thereafter he engages in a detailed discussion of each of the foregoing causes. We are of the opinion that the foregoing enumerated difficulties alone in connection with the lie detector use present obstacles to its acceptability as an instrument of evidence in the trial of criminal cases, notwithstanding its recognized utility in the field of discovery and investigation, for uncovering clues and obtaining confessions. This conclusion is in line with the weight of authority repudiating the lie detector as an instrument of evidence in the trial of criminal cases. In addition to the foregoing conclusion, they give other cogent reasons for its inadaptability as an instrument of evidence in the trial of cases, such as the impossibility of cross-examining the machine (a constitutional impediment), also pointing out those human elements of fallability which surround interpretation of the lie detector recordings. In this connection these devices are unlike the science of handwriting, fingerprinting and X-ray, which reflect demonstrable physical facts that require no complicated interpretation predicated upon the hazards of unknown individual emotional differences, which may and oftentimes do result in erroneous conclusions.

The earliest reported case repudiating the use of. the lie detector test as evidence in the trial of a criminal case was that of Frye v. United States, 54 App. D. C. 46, 293 F. 1013, 34 A. L. R. 145. This case is cited and quoted from in State v. Bohner, 210 Wis. 651, 246 N. W. 314, 317, 86 A. L. R. 611. In that case, involving a robbery, the defendant had the examination made and offered the results in evidence to prove his innocence. The Supreme Court of Wisconsin sustained the trial court in repudiating the offer. Therein it was said:

"Upon the question raised by this assignment of error there has been, so far as we can discover, only one reported decision. In Frye v. United States, 54 App. D. C. 46, 293 F. 1013, 1014, 34 A. L. R. 145, defendant had submitted to a deception test, and offered the scientist who conducted the test as an expert to testify to the results obtained. The trial court sustained the objection to the offer. Upon appeal the court said:

" 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

" 'We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made.'

"See notes 34 A. L. R. 145; 24 Columbia Law Review, 429; 37 Harvard Law Review, 1138; 33 Yale Law Journal, 771.

"We are not satisfied that this instrument, during the ten years that have elapsed since the decision in the Frye Case, has progressed from the experimental to the demonstrable stage. In his work on Principles of Judicial Proof (2d Ed.) 1931, Dean Wigmore says: 'Looking back at the range of possibilities for experimental psychometric methods of ascertaining concrete data for valuing testimonial evidence, it will be seen that thus far the only new psychometric method that has demonstrated any utility is the blood-pressure method, which detects lies; * * * the record of psychometric achievement with testimony is still meager. * * * The conditions required for truly scientific observation and experiment are seldom practicable. The testimonial mental processes are so complex and

variable that millions of instances must be studied before safe generalizations can be made.'

"It seems to us that this statement offers little comfort to one who contends that this device is past the experimental stage. While it may have some utility at present, and may ultimately be of great value in the administration of justice, it must not be overlooked that a too hasty acceptance of it during this stage of its development may bring complications and abuses that will overbalance whatever utility it may be assumed to have. The present necessity for elaborate exposition of its theory and demonstration of its practical working, in order to convince the jury of its probative tendences, together with the possibility of attacks upon the soundness of its underlying theory and its practical usefulness, may easily result in a trial of the lie detector rather than the issues in the cause. If the defendant in a criminal case is to be permitted to have tests taken outside of court and then to produce expert testimony as to the results of the tests when these are favorable to him, without the necessity of taking the stand or submitting to tests by the prosecution, the way would seem to be open to abuses that would not promote the cause of justice. It is our conclusion that the refusal of the trial court to admit this testimony was not error."

In this connection such procedure would resolve into a swearing match. And, not to overlook the human element, we can foresee conditions where to ascertain the truth, it would become necessary to require the operator of the machine to submit to a test to determine the truthfulness of his interpretations. Another case in which the use of the lie detector test was refused is that of People v. Becker, 1942, 300 Mich. 562, 2 N. W. 2d 503, 505, 139 A. L. R. 1171. Therein the defendant was charged with the crime of manslaughter. He offered in evidence lie detector tests in support of his contention that he killed the deceased in self-defense. In sustaining the trial court's refusal to admit the results of this test in evidence, the Supreme Court of Michigan said:

"The general principle of the acceptance of the lie detector test is set forth in 20 Am. Jr. p. 633: 'Physiological or psychological deception tests used as instruments for the ascertainment of the truthfulness of a witness are still too much in the experimental field for the courts to approve of their general use. The deception tests devised by scientists are of the following three broad types: The association-reaction tests in which the time the subject takes to think of words associated with those in a list given him, some of which are neutral and some of which may evoke a guilty association, is carefully measured; the respiratory test, which is based upon the hypothesis that the breathing of the subject varies according to whether he is telling the truth; and the systolic blood pressure test. The instances in which such criteria have been subjected to judicial scrutiny are relatively infrequent. Those which have passed upon the question have held that the systolic blood pressure deception test for determining the truthfulness of testimony has not yet gained such standing and scientific recognition as to justify the admission of expert testimony deduced from tests made under such theory.'

"We see no reason why, under the circumstances of this case, the result should have been admitted. There was no testimony offered which would indicate that there is at this time a general scientific recognition of such tests. Until it is established that reasonable certainty follows from such tests, it would be error to admit in evidence the result thereof."

One of the most recent cases stating additional reasons for denial of the use of the lie detector test results in evidence is that of State v. Lowry, 1947, 163 Kan. 622, 185 P. 2d 147, 150, wherein it was said:

"The practical effect of the admission of this testimony was to constitute a mechanical device—as reported by the operator—a sort of witness in absentia on the question of the defendant's guilt or innocence.

"In no case cited by appellee or found in our own research has a court of last resort sanctioned the admission of such testimony. Nor has any trial

court, as far as we are aware, admitted testimony, over objection, as to the result of such tests upon a complaining witness. The ultimate, logical result of doing so would be to have such tests made upon all witnesses for the purpose of helping the jury determine their credibility.

"Cogent reasons in support of this attitude of the courts readily suggest themselves. In the first place, the vital function of cross-examination would be impaired. The operator, appearing as a witness to report and interpret the results of the test, might be questioned as to his qualifications, experience, his methods, and on similar matters, and that is about all. But the machine itself— conceding the comparatively high percentage record as to accuracy and reliability claimed for it—escapes all cross-examination. There is no persuasive analogy here with such tests as fingerprinting which have a strictly physical basis, clearly demonstrable. It is not contended that the lie detector measures or weighs the important psychological factors. Many innocent but highly sensitive persons would undoubtedly show unfavorable physical reactions, while many guilty persons, of hardened or less sensitive spirit, would register no physical indication of falsification. This the trained operators of course understand, and proceed upon the basis of a large percentage of error. But it seems quite too subtle a task of evaluation to impose upon an untrained jury.

"Consider the situation in the instant case. Two men were involved. One was a defendant on trial. The other was merely a witness and under no such emotional strain. Can it be said that with such wholly different mental states existing, the tests would be equally fair? Must the jury be asked to consider and weigh such intangible and elusive elements?

"We are not ready to say that the lie detector has attained such scientific and psychological accuracy, nor its operators such sureness of interpretation of figures on a dial that the testimony here in question was competent, over objection, for submission to a jury holding the fate of the defendant in its hands. It must be remembered that we are not here considering a case where there was a prior agreement that the results of the test might be admitted in evidence. * * *

"All this is not to discredit the lie detector as an instrument of utility and value. Its usefulness has been amply demonstrated by detective agencies, police departments and other law-enforcement agencies conducting criminal investigations. It is also being frequently employed in matters, other than investigation of crimes. By its use admissions and confessions are frequently secured, and facts developed which assist in further discoveries. Such admissions and confessions, if otherwise competent, have generally been admitted, and no reason now appears why they should not be admitted. But we are not here dealing with such question. * * *

"In an article in 29 Cornell Law Quarterly 535 (1944), the writer, who looks with favor upon a larger use of such tests in criminal procedure, discusses a number of cases in most if not all of which admission of such testimony was refused. While the writer thinks that the results that have been attained 'would seem to justify the assertion that using the results of lie-detector tests to verify the testimony of important witnesses would be an inestimable advance in the efficiency of the legal process,' he none-the-less concedes that there are real difficulties attendant upon use of lie detector tests by the courts, which 'merit serious consideration.' He says:

" '* * * First, a party might produce only those tests which were favorable to himself, and his opponent would not be able to examine him under the lie-detector, nor to cross-examine him should he refuse to take the stand. Second, it would be difficult for the opposing counsel to expose an incompetent or dishonest expert and to cross-examine him concerning the tests, because the lie-detector is not adequately standardized as to instrument, manner of conducting tests, qualifications of examiners, and interpretation of the records.'

"A leading authority on the lie detector is Fred E. Inbau, professor of law at Northwestern University. As an associate of Dr. Keeler of Northwestern,

who is credited with perfecting the instrument, he is a firm believer in the usefulness and reliability of the instrument and has had wide experience in its use. But Professor Inbau apparently does not share the view entertained by some enthusiasts that courts should readily admit in evidence testimony or the results of such tests. In an article in the Boston University Law Review (April, 1946), Professor Inbau says:

" 'A number of trial courts have admitted in evidence the testimony of lie-detector examiners as to their interpretation of test records in instances where, prior to the test, counsel for both litigants agreed and stipulated that the test results could be used in evidence without objection on the part of the party adversely affected thereby. Although no appellate court has thus far passed upon the legality of such agreements and stipulations, a prediction may be ventured that the procedure would be declared valid, with the proviso, however, that the approval or disapproval of the agreement and stipulation in any given case should rest within the trial court's discretion. But in the absence of such pre-test agreements and stipulations, the test records and the examiner's interpretation thereof have been held inadmissible as evidence by every appellate court which has had occasion to consider the matter, for the very understandable reason that the test had "not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made." ' "

The logic and reason set forth in these cases make our conclusions herein inescapable. It was not error for the trial court to sustain objection to the defendant's attempt to prove the fact of taking and the results of the lie detector test.

As to the truth serum test, it is even more experimental than the lie detector test. In "The Detection of Deception—A Resume", Topical Law Reports, 1947-48, No. 4-27, page 3011, it is said:

"The term 'truth serum,' like 'lie-detector,' is a misnomer. There is no specific serum which will cure or reveal deception—no drug which will infallibly induce truth. There are, however, certain drugs which will deeply affect one's consciousness. In such a mental state, the subject is not in a position where he can readily determine the type of answer to give to questions put to him. His ability to associate thoughts and express only those which he wishes others to hear is diminished, and as a result it is exceedingly difficult for the subject to attempt deception. Thus, 'narcoanalysis' or 'narcosynthesis' does not describe the use and effect of a 'truth serum,' but rather the process of inducing a state of mind by the application of a drug whereby an individual's capacity to unite thoughts and choose those to which he desires to give utterance is inhibited.

"Notwithstanding that the results obtained from narcosynthesis would not be admissible as evidence, the process has been utilized successfully. That the process has real merit has been demonstrated by Dr. W. F. Lorenz of the University of Wisconsin. ('Crimnial Confessions Under Narcosis', (1932) 31 Wis. Med. J. 245.) He states that the best results have been secured in situations where an innocent person has been suspected, but that experience with those who are presumably guilty has not been sufficient so that an opinion can be expressed as to the value of the process in causing confessions of serious crimes."

It is therefore apparent that the efficacy of neither the lie detector nor the truth serum test has gained that standing and scientific recognition nor demonstrated that degree of dependability to justify the courts in approving their use in the trial of criminal cases. Therefore, the trial court was not in error in sustaining the state's objection to the defendant's tender of the results of such test to which he contends he consented.

While the evidence herein is sufficient to sustain the conviction, we are not convinced that the identification reaches that high degree of moral certainty

required to warrant the state to take the defendant's life. There is in this case a margin of doubt created by the victim's lack of conviction on cross-examination as to identification of the defendant. It must be recalled that she testified she was so frightened she did not look at her assailant when they were driving around. Moreover, she said she was too scared to stare at him when they were stopped. Furthermore, she was in such a state of frustration that in driving back home after the crime, she lost her way home, drove out into the outskirts of Tulsa, and discovering she was lost turned around, drove back into Tulsa and found her way and went home. Then, too, with the foregoing things in mind, we cannot overlook the fact that more than two months elapsed between the date of the crime and victim's identification of this defendant. For this reason, as well as because of the resulting prejudice from the introduction of evidence of another unrelated assault upon another party, we are reluctant to affirm the judgment and sentence herein imposed. If it were not for these two elements in the case, we would have no hesitancy in affirming the judgment and sentence. Nevertheless, we do not believe that the conviction itself constitutes a miscarriage of justice. We are of the opinion that if the case were tried over again and again, the result would be a verdict of guilty, but the death penalty should be imposed only in cases beyond speculative doubt and where the record is free from prejudicial error. We repeat, in those cases only, where the evidence reaches that degree of moral certainty which takes the case out of the realm of speculative doubt, are we justified in sustaining the extreme penalty. Hence, under the record herein as a whole, we are of the opinion that the case should be modified from death to a definite term of years. But being cognizant of the rule invoked by the Pardon and Parole office, that at the expiration of service of 15 years or one-third of 45 years, the average life sentence, defendant is eligible to be considered by the board for parole, and being fully cognizant of the responsibility of this court to the defendant and yet cognizant of his demonstrated propensity and of our duty to enforce the law to the end of the public good, it is the opinion of this court that the judgment and sentence herein imposed should be and hereby is modified from the death penalty to a term of 150 years, and as so modified is otherwise affirmed.

JONES and POWELL, JJ., concur.