Aud James PENNY, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13540.

Court of Criminal Appeals of Oklahoma.

Jan. 5, 1966.

Rehearing Denied Feb. 14, 1966.

Albert J. Hoch, Oklahoma City, for plaintiff in error.

Charles Nesbitt, Atty. Gen., State of Oklahoma, for defendant in error.

BUSSEY, Presiding Judge.

Aud James Penny, hereinafter referred to as defendant, was charged in the Court of Common Pleas in and for Oklahoma County, with the offense of Operating a Motor Vehicle While Under the Influence of Intoxicating Liquor. He was tried by a jury who found him guilty. Judgment and sentence was pronounced in accordance with the verdict of the jury and a timely appeal has been perfected to this Court.

Briefly, the facts as adduced from the record, disclose that between the hour of 7:30 p. m. and 8:00 p. m., an automobile driven by defendant collided with an automobile driven by Mr. Walter Burman Johnson at the intersection of 66th and South Shields in the city of Oklahoma City, Oklahoma. From the point of impact, Penny's car came to rest upon the property of a Show Home lot. Mr. Johnson testified that after the collision he proceeded to Penny's automobile; that Penny was still inside and that there was a strong odor of intoxicating liquor inside the car. The witness returned to his automobile and caused the police to be notified. Officer Logan Edward Waldrup, in response to a message from the Police Dispatcher, proceeded to the scene of the accident where, after making an investigation and talking to the defendant, he took the defendant into custody and proceeded to the Oklahoma City Police Department. This witness testified that defendant had a strong odor of intoxicants about his person, that his speech was slurred and that in the witness' opinion the defendant was drunk.

After being taken to the police station, the State's witnesses testified that the defendant was advised of his constitutional rights and that thereafter he voluntarily submitted to certain physical tests and to the Breathalyzer Test administered by Officer Coffia. Defendant admitted at the trial that he submitted to the Breathalyzer Test, but thought it was a blood test. He testified that he did not remember having performed certain physical tests, but did not deny that he might have consented to perform them or that he did perform them. Defendant denied that he was intoxicated and stated that he had had two beers early in the afternoon and testified that after he had been turned over to the Oklahoma County authorities by the Oklahoma City Police Department, he discovered injuries to his head and leg. Defendant introduced testimony of witnesses that he was a very moderate drinker and the testimony of Dr. Jobe who treated him subsequent to his release from custody. Dr. Jobe testified that the bruises, cuts and contusions on the temporal region of defendant's head could have interfered with his ability to perform coordination tests and other tests relating to balance.

There was substantial testimony introduced on behalf of the State which related to the Breathalyzer machine, its operation, reliability, accuracy, and the manner in which Officer Coffia administered the test.

There are numerous assignments of error urged on appeal but for the sake of brevity, we will deal only with those which have some merit.

■ Defendant's first assignment of error is that this cause must be reversed and remanded for the reason that the defendant was arrested by Officer Waldrup who was not present when the collision occurred, nor was there any misdemeanor committed in his presence after said officer arrived at the scene. Defendant further argues that the arrest being unlawful, any evidence obtained as a result of the search and seizure thereafter was inadmissible against him. In his brief the defendant states:

"The defendant herein agreed with the decisions of this Honorable Court in many cases in which this Court has held that an Officer may testify to anything which he observes in a place or locale where he has a right to be, and that the County Attorney has the right to decide on what type of charges shall be filed.

The defendant further admits and stipulates that in this particular case, Officer Waldrup had authority to be at the scene of the accident and to make an investigation at the scene. That he would be qualified to testify as to what he observed and what was said by the defendant at the scene. The defendant herein would stipulate to the fact that if the Officer had seen the defendant commit any offense in his presence, that he would have authority to arrest him for that offense and any evidence which he might obtain as a result of that offense would be admissible in the prosecution of this case."

In support of this proposition the defendant relies upon the case of Shirey v. State, Okl. Cr., 321 P.2d 981.

In the State's brief in answer to defendant's first assignment of error, it is pointed out that the defendant entered a plea to the merits, proceeded to trial, did not interpose an objection to the testimony of Officer Waldrup, and raised the question of illegal search and seizure for the first time at the conclusion of all the State's evidence; notwithstanding the fact that the justification of Officer Waldrup's arrest and the time of the same was extensively covered during the direct testimony and cross examination of this witness.

In Shirey v. State, supra, relied on by both the defendant and the State, it was abundantly clear that no offense was committed in the presence of the officer and that when it became apparent that the State intended to rely upon the arrest, timely objection was interposed by the defendant to the admission of any evidence obtained by a search and seizure in connection with the arrest and an exception taken to the ruling of the court.

We are of the opinion that Shirey v. State, supra, has no application in the instant case since the evidence of which the defendant now complains was not obtained as a result of a search and seizure, but as reflected by the record, was obtained as a result of the defendant's voluntary participation in certain physical coordination tests and his submission to the Breathalyzer Test. It is interesting to note that the State's evidence reflects that the defendant voluntarily submitted to these tests after being fully advised of his constitutional rights and that the defendant does not assert that they were involuntarily participated in as a result of coercion or force, but asserts only that he cannot remember having participated in such tests.

We are of the opinion, and therefore hold, that defendant's first assignment of error is without merit. This leads us to consideration of defendant's second assignment of error that the breathalyzer is not a scientific machine developed with sufficient accuracy to be used in the determination of the alcoholic content of a person's blood in order to determine him intoxicated.

The admissibility of the results of a Breathalyzer Test has not been previously passed upon by this Court; however, in ruling admissible the results of the Hager

Drunkometer, in Toms v. State, 95 Okl.Cr. 60, 239 P.2d 812, in the body of the opinion, this Court, speaking through the Honorable John A. Brett had this to say:

"This court is of the opinion, that we should favor the adoption of scientific methods for crime detection, where the demonstrated accuracy and reliability has become established and recognized. Justice is truth in action, and any instrumentality, which aids justice in ascertainment of truth, should be embraced without delay. * * * We believe, in light of the foregoing, chemical tests by experts of body fluids as blood, urine, breath, spinal fluid, saliva, etc., under varying conditions have been approved as having gained that scientific recognition for infallibility as to be admissible in evidence. In this connection this type of evidence is of a higher quality than truth serum and lie detector tests which were not recognized in Henderson v. State, [94] Okl. Cr.App. [45], 230 P.2d 495 [496, 23 A.L.R.2d 1292]."

In the instant case, to establish the reliability of the Breathalyzer Test, the State offered the testimony of Dr. Kurt M. Dubowski. The record discloses that Dr. Dubowski is a clinical and forensic chemist and toxicologist. To show his qualifications it was established that he is Associate Professor of Clinical Chemistry and Toxicology at the University of Oklahoma School of Medicine, Director of the Clinical Chemistry and Toxicology Laboratories, University of Oklahoma Hospitals; consultant in clinical chemistry and toxicology, Veterans Administration Hospital, Oklahoma City; Secretary-Treasurer of the American Board of Clinical Chemistry and a Director of said Board. Dr. Dubowski received a Bachelor of Arts degree in chemistry and biology from New York University; he did additional undergraduate training and was in chemical engineering at Ohio State University, resulting in Army Specified Training Program and received a Certificate in Chemical Engineering. He then received a Master of Science degree in chemistry and toxicology and a Doctor of Philosophy degree at Ohio State University. In addition to his teaching position at the University of Oklahoma Medical School, he held essentially the same positions at the University of Florida, College of Medicine and the Health Center in Gainesville, Florida; lecturer at Northwestern University, University of New York, and State University of Iowa. As to positions in the field of forensic chemistry and toxicology, he was criminal laison for the Gainesville, Florida Police Department, Director of the Florida State Poison Information Center; State Criminal Laison for the State of Iowa, Chief Deputy Coronor and Toxicologist for the Polk County Coronor's Office in Des Moines; Toxicologist for the Iowa State Poison Information Center. He is a member of the American Academy of Forensic Science, the American Medical Association; National Safety Council Committee on Alcohol and Drugs, including the Executive Board of that Committee; Society of Medical Jurisprudence, and International Association of Forensic Toxicologists. As to experience, Dr. Dubowski was State Criminalist in the examination of physical and biological evidence materials, including blood and body tissues for the presence of alcohol and for other poisons in the State of Iowa and in the State of Connecticut the examination of suspected drinking drivers and the effects of alcohol. In regard to teaching or instructing in the State of Oklahoma, Dr. Dubowski participated in the first course in chemical tests for intoxication at the University of Oklahoma in Norman in the Peace Officer's Extension Program at the Kellogg Center. In addition to these qualifications, the record discloses that Dr. Dubowski has attended and participated in the Northwestern Traffic Institute at Evanston, and that he is thoroughly familiar with the various types of machines used to analyze breath samples for alcoholic content.

After thus having qualified as an expert in the field, Dr. Dubowski's testimony relating to the reliability of the Breathalyzer was as follows:

Q. What experience have you personally had with the Breathalyzer?

A. I have been associated with it ever since its early development in 1954, and as a matter of fact contributed slightly to its original design and construction.

Q. How many experiments have you personally conducted upon human beings, making use of the Breathalyzer and blood tests?

A. Well that's hard to say; there have been several hundred experiments involving a number of people on each occasion.

Q. Are you acquainted with the scientific principles involved in its operation?

A. Yes.

Q. Have you made a study of the literature concerning its principles of operation?

A. Yes.

Q. Have you discussed the operation of the Breathalyzer Machine with any recognized authorities or groups?

\* \* \* \* \* \*

A. Yes.

Q. Are you familiar with the Breathalyzer owned by the Oklahoma City Police Department?

A. Yes.

Q. Have you ever used that machine?

A. Yes.

Q. Have you performed any functions or duties with respect to that machine?

A. Yes.

Q. What are those?

A. In short, I determined the reliability of this equipment for the establishment of blood alcohol level, specifically testing the instrument itself, testing the things used with it, and testing the overall results obtained by means of its use.

\* \* \* \* \* \*

Q. Based on your use of the Breathalyzer generally and the experiments you have performed specifically with this machine, do you have an opinion as to the reliability of that device and the chemical procedure used therein to determine the blood alcohol concentration?

A. Yes.

Q. What is your opinion as to the reliability of that device and the chemical methods used?

A. I believe that it is completely reliable and valid and that it reveals the correct blood alcohol level.

■ We are of the opinion that the Breathalyzer has attained that degree of reliability and accuracy sufficient to render its results admissible in evidence provided that the standards established in Alexander v. State, 305 P.2d 572 (Okl.Cr. 1956), relating to the admission of such evidence, have been complied with.

This leads us to a consideration of the defendant's third assignment of error that the State failed to prove that the machine was in proper working order at the time the test was administered to the defendant herein; that the State failed to show that there had been any tests made to determine the volume or the percentage of the compound used in the ampoules; that the State further failed to show that the defendant's mouth was free of any foreign matter at the time he took this test, and that by reason of the State's failure to meet these requirements, the result of the Breathalyzer would be inadmissible. It is the position of the State, in response to this assignment of error that:

"Alexander v. State, 305 P.2d 572 (Okl. Cr.1956) held that for the results of a breath test to be admissible, proof must show:

'1. Proof that the chemicals were compounded to the proper percentage

for use in the machine. 2. Proof that the operator and the machine were under periodic supervision of one who has an understanding of the scientific theory of the machine. 3. Proof by a witness who was qualified to calculate and translate the reading of the machine into percentage of blood alcohol in the blood; that is, one who can eliminate the hearsay evidence.'

In this case all of these requirements have been complied with. In the course of administering the test to this defendant, the ampoule containing the reagent chemicals was gauged, or measured, before being inserted into the machine. The officer at that time noted that the ampoule contained the required amount of solution. Since these ampoules are manufactured and sealed at the factory in New Jersey, it would be impossible to test the *concentration* as opposed to the amount of solution in the ampoule without breaking it open and thus destroying its usefulness. There is only one way to determine if the ampoule used to test this defendant contained the proper concentration or percentage of chemicals. That procedure was followed in this case. After the test on the defendant was completed, an equilibrator standardization test was run using the same ampoule which had been used to test the defendant's breath.

* * * A solution with a predetermined amount of alcohol is put into a container and the vapor from that solution is blown into the breathalyzer machine by an aspirator bulb in the same way in which a human being would breathe into the machine. In effect, another breathalyzer test is run using a volume of air with a known concentration of alcohol. Officer Coffia" (who had received instruction at the Northwestern Institute and also at the Kellogg Foundation in the operation of the Breathalyzer), "testified that on completion of this equilibrator standardization test, the breathalyzer machine registered the same alcohol concentration as that known to be in the predetermined solution. This standardization test was run using the ampoule employed in the test of the defendant here. If the concentration of chemicals in that ampoule had not been correct, the machine reading would not have corresponded to the known alcohol concentration of the air pumped into the machine. Since there was a correspondence, it is clear that the ampoule used to test this defendant contained the proper concentration of chemicals.

The same kind of a test performed the night before, after the machine had been thrown on the floor and repaired, disposed of any possibility that inaccuracies were caused by damage to the machine. When the machine was thrown on the floor by another defendant, the galvanometer was broken. An identical galvanometer taken from the Police Department's other breathalyzer was used to replace the damaged instrument. After completion of these repairs, another equilabrator standardization test was run and the machine was found to be operating accurately.

The availability of this equilibrator standardization testing procedure disposes of the necessity for tearing the machine down to check measurements of the gears, traverse rod, etc. * * * Not only Officer Coffia, but also Dr. Kurt Dubowski, the expert intimately familiar with the principles and operation of the machine, testified that his experience with, and supervision over the machine, indicated it was 'completely reliable'.

The testimony also indicates that the State complied with the requirement in Alexander v. State that proof be given that the operator and the machine were under periodic supervision of one who has understanding of the scientific theory of the machine. The case-made

indicates Dr. Dubowski, who was qualified as an expert on the machine, its scientific principles and its operation, testified that for approximately a year prior to testing of this defendant, he had been performing reliability checks on this machine and the operator, Officer Coffia. He was thus able to testify that the machine was reliable and the operator competent to perform the function. With respect to the operator, this was corroborated by the correspondence which existed between the Officer Coffia's narration of his performance of the test, with Dr. Dubowski's narrative of the proper procedure for performing the test.

The State also complied with the third requirement. The Alexander case held that one qualified to operate the machine, though not qualified to testify to its scientific principles upon which it is based, is still entitled to give testimony as to what the machine read. This is what Officer Coffia did" (when he related that the results indicated a reading of 0.21). "Dr. Dubowski was qualified as an expert on the scientific principles involved in the machine. It was he who interpreted the results shown by the machine upon completion of the test on the defendant.

Officer Coffia also testified he waited fifteen minutes before administering the test to the defendant. This was to allow any recently drunk alcohol to be absorbed, so that the test register only the alcoholic content of deep lung air.

Thus, all required procedures in administering the test and establishing admissability of the result have been complied with."

We are of the opinion that the State's position as above set forth, is amply supported by the record and that all the standards set forth in Alexander v. State were fully complied with and that the court properly admitted the evidence of the results of the breathalyzer test.

There are other assignments of error which are equally without merit and we deem it unnecessary to prolong this opinion by considering them. Suffice it to say that the evidence amply supports the verdict of the jury; the trial was free of fundamental error; and the trial court fairly and fully instructed the jury. For all of the reasons above set forth, the judgment and sentence appealed from is affirmed.

BRETT and NIX, JJ., concur.