State of Utah, in the Interest of **Jefferey M. OAKS, a minor.**

**No. 14896.**

Supreme Court of Utah.

Nov. 14, 1977.

Robert M. McRae, Salt Lake City, for Jefferey Oaks.

Robert B. Hansen, Atty. Gen., Bruce M. Hale, Asst. Atty. Gen., Salt Lake City, Whitney D. Hammond, Uintah Co. Atty., Vernal, for respondent.

ELLETT, Chief Justice:

In the Juvenile Court defendant was convicted of driving a motor vehicle while under the influence of intoxicating liquor (Section 41–6–44, U.C.A.1953).[1] He now appeals.

The arresting officer first noticed defendant driving a vehicle shortly before midnight at an apparently high rate of speed. The officer pursued defendant for a distance until he could no longer see him. Later he observed a vehicle, parked at the side of the road, that was the same automobile he had previously seen. Upon contacting defendant, the officer noted the odor of an alcoholic beverage on his breath. According to the officer, defendant's face was flushed, his eyes were "kinda" bloodshot, and his speech was not good.

Defendant was arrested and given a field sobriety test. Again, according to the officer, defendant did poorly when directed to touch his nose with his finger and when he walked the white line. Defendant was taken to the police station in Vernal, Utah, where the arresting officer gave him a breathalyzer test.

The foregoing facts were adduced at the trial. The state then proceeded to question Officer Horton concerning the manner in which he administered the breathalyzer test and to lay a foundation for the introduction into evidence of Exhibits 1 and 2. (Exhibit 1 concerned the administration of the test, and Exhibit 2 indicated the results of the test.)

Defense counsel did not object to any evidence concerning the result of the test; but in his brief on appeal, appellant claims error in that the officer had failed to fill in the blanks on Exhibit 1, identifying by

1. Sec. 55–10–105(2) provides that an adjudication by a juvenile court shall not be deemed a conviction of a crime, except in cases involving traffic violations.

number the machine and ampoule used in the test. A Highway Patrol officer was called as a witness. Defense counsel stipulated that he was qualified to repair and analyze breathalyzer machines. The sergeant testified that a certain machine had been located in the Vernal station over the years; however, he did not know if the machine was there on March 24, 1976. He testified that he had checked machine # 2979 on March 4 and May 25, 1976, and found it to be working properly both times. To his knowledge, there was no other machine located in the Vernal station during the aforementioned dates. The court admitted the exhibits into evidence. Exhibit 2 indicated a blood alcohol content of .11 percent.[2]

■ Aside from the breathalyzer test, the evidence before the court was sufficient to justify the verdict. Such evidence was as follows:

(1) The attention of the officer was directed to the appellant because of the excessive speed at which appellant was driving.

(2) The face of appellant was flushed, his eyes were bloodshot, and his speech was poor.

(3) Appellant was unable to perform the field sobriety tests; to-wit: he could not walk a straight line, pick up coins, or touch his nose with his finger without difficulty.

(4) Two officers testified that appellant had been drinking.

■ The smoke screen about the breathalyzer machine is without validity. The machine was the only one used in the area, and it made no difference whether the technician recorded its number on the test card or did not so record it. Also the fact that the machine was accurate on March 4 and on May 25 leads to the fair conclusion that it was accurate on March 24. A quali-

fied technician can administer a test and then testify to his findings. The omission of the number of the machine or of the ampoule on the test card would not make the testimony of the expert incompetent. This would be true even if the ampoule were lost or destroyed. Further, as to the number of the ampoule not being on the test card, the matter was not raised at trial and, therefore, cannot be claimed as an error on this appeal.[3] In fact, when the tests were offered into evidence, counsel for Mr. Oaks asked the court to withhold the ruling until after the cross-examination of the witness. At the end of all the testimony, defense counsel moved to dismiss "on the grounds that the state failed to make a _____ no evidence." The court's reply was as follows:

THE COURT: When the Court considers the total evidence, that you add to it the appearance of the young man at the time and physical tests, coupled with the tests which, by the way, I received in evidence.

MR. MCRAE: Did you also receive the report and referral?

THE COURT: Yes. Motion denied.

MR. MCRAE: And what is the finding of the Court?

THE COURT: Found guilty.

There was never any objection made at trial to the result shown by the tests; hence, there cannot be any question of error in that regard raised on this appeal.[4]

The judgment is affirmed. No costs are awarded.

CROCKETT, and HALL, JJ., concur.

MAUGHAN, Justice (dissenting).

In the Juvenile Court, defendant was convicted of driving a motor vehicle while under the influence of intoxicating liquor (Section 41–6–44, U.C.A. 1953).[1] He ap-

---

2. U.C.A., 1953, 41–6–44.2. This section makes it unlawful to drive a motor vehicle when the alcoholic content by body weight is .10% or greater.

3. *Hamilton, et al. v. Salt Lake County Sewerage, etc.*, 15 Utah 2d 216, 390 P.2d 235 (1964).

4. *Id.*

1. Sec. 55–10–105(2) provides that an adjudication by a juvenile court shall not be deemed a conviction of a crime, except in cases involving traffic violations.

peals. We should reverse, and remand for a new trial.

The arresting officer first noticed defendant driving a vehicle, at an apparently high rate of speed, shortly before midnight. The officer pursued defendant for a distance, until he could no longer see him. Later he observed a vehicle, parked at the side of the road, which was the same automobile he had previously seen. Upon contacting defendant, the officer noted the odor of an alcoholic beverage on his breath. According to the officer, defendant's face was flushed, his eyes were "kinda" bloodshot, and his speech was not good.

Defendant was arrested and given a field sobriety test. Again, according to the officer, defendant did poorly when directed to touch his nose with his finger and when he walked the white line. Defendant was taken to the police station in Vernal, Utah, where the arresting officer, Deputy Sheriff Horton, gave him a breathalyzer test.

The foregoing facts were adduced at the trial. The state then proceeded to question Officer Horton concerning the manner in which he administered the breathalyzer test and to lay a foundation for the introduction into evidence of Exhibits 1 and 2. (Exhibit 1, concerned the administration of the test, and Exhibit 2, indicated the results of the test.)

Defense counsel objected to any evidence concerning the result of the test on the ground there was no foundation to establish the admissibility of such evidence. Specifically, the officer had failed to fill in the blanks on Exhibit 1, identifying by number the machine and ampoule used in the test.

The court permitted officer Horton to continue with his testimony. He testified he had attended a breathalyzer school conducted by the Highway Patrol. He had attended a refresher course the previous autumn. (The test was conducted on March 24, 1976.) The officer guessed the machine, presently situated in the Vernal station, was the one he used. Defense counsel stipulated the officer had performed the specified eight steps in administering the test.

Sergeant Duane Richens, of the Highway Patrol, was called as a witness. Defense counsel stipulated the sergeant was qualified to repair and analyze breathalyzer machines. The sergeant testified that a certain machine had been located in the Vernal station over the years; however, he did not know if the machine were there on March 24, 1976. He testified that he had checked machine # 2979 on March 4 and May 25, 1976, and found it to be working properly both times. To his knowledge, there was no other machine located in the Vernal station during the aforementioned dates. The officer further testified that a qualified breathalyzer operator is supposed to fill in the blanks on Exhibit 1, and Exhibit 2 is supposed to correlate with Exhibit 1.

The court admitted the Exhibits as evidence. Exhibit 2 indicated a blood alcohol content of .11 per cent.

The court based its decision on all the evidence, and found defendant guilty of operating a motor vehicle under the influence of alcohol.

Defendant contends that, before the results of a breathalyzer test can be admitted, the state must first establish certain foundational evidence to assure its reliability.

In 2 Jones On Evidence (6th Ed. Gard), Section 14.37, pp. 695–696, it is stated that the reliability of analysis of body fluids, or of the breath, to determine the alcoholic content of a person's blood is almost universally recognized by the courts:

> . . . Accordingly, where a proper foundation is laid to establish relevancy in point of time, and to show the qualifications of the technicians and others called as witnesses to establish the reliability of the test and to read its results, expert testimony on the subject is readily admissible.
>
> *　*　*　*　*　*
>
> Variations of strictness with respect to foundation testimony may often be explained by the type of test administered,

as where the alcoholic content of blood is ascertained by an analysis of breath, which is a more technical procedure than an analysis of the blood itself in that the former involves an extra step in scientific rationalization.

State v. Baker[2] provides the following description:

The breathalyzer is a machine designed to measure the amount of alcohol in the alveolar breath and is based upon the principle that the ratio between the amount of alcohol in the blood and the amount in the alveolar breath from the lungs is a constant 2100 to 1. In other words, the machine analyzes a sample of breath to determine the alcoholic content of the blood.

     *    *    *    *    *    *

To operate the machine, the subject blows into the machine through a mouthpiece until he has emptied his lungs in one breath. The machine is so designed that it traps only the last 52½ cubic centimeters of air that has been blown into it. This air is then forced, by weight of a piston through a test ampoule containing a solution of sulphuric acid and potassium dichromate. This test solution has a yellow hue to it. As the breath sample bubbles through the test solution, the sulphuric acid extracts the alcohol, if any, therefrom, and the potassium dichromate then changes the alcohol to acetic acid, thereby causing the solution to lose some of its original yellow color. The greater the alcoholic content of the breath sample, the greater will be the loss in color of the test solution. By causing a light to pass through the test ampoule and through a standard ampoule containing the same chemical solution as the test ampoule (but through which no breath sample has passed), the amount of the change in color can be measured by photoelectric cells which are connected to a galvanometer. By balancing the galva-

nometer, a reading can be obtained from a gauge which has been calibrated in terms of percentage of alcohol in the blood.

In Lauderdale v. State,[3] the court observed that it is critical to the results of the test that precisely three milliliters be contained in the ampoules. If the volume were less than three milliliters, the final result would be a falsely elevated level of alcohol. Furthermore, each ampoule must contain .025 per cent of potassium dichromate, which is critical to the test within a range of approximately a 33⅓ per cent variance. Another aspect of importance is the character of the glass of the ampoule. Imperfections in the glass cause diffusion of the light going through it, and these would tend to make the reading on the galvanometer incorrect.

To assure the reliability of any test result of a breathalyzer admitted into evidence, the courts have required as a prerequisite that the state adduce certain foundational evidence. In State v. Baker[4] the court held that before the result of a breathalyzer test can be admitted into evidence, the state must produce prima facie evidence that each of the following four requirements have been met:

. . . (1) That the machine was properly checked and in proper working order at the time of conducting the test; (2) that the chemicals employed were of the correct kind and compounded in the proper proportions; (3) that the subject had nothing in his mouth at the time of the test and that he had taken no food or drink within fifteen minutes prior to taking the test; (4) that the test be given by a qualified operator and in the proper manner.[5]

The court in its discussion of the requirement said the state's evidence showed the ampoules were shipped from the manufacturer in batches and each batch had a control number, which was stamped on each

2. 56 Wash.2d 846, 355 P.2d 806, 809 (1960).

3. Alaska, 548 P.2d 376, 379 (1976).

4. note 1, supra.

5. at pp. 809–810 of 355 P.2d.

and every ampoule in that particular batch. Everytime a new batch was received, a spot check was made of at least six ampoules in that batch. The court ruled:

> The fact that the *sealed* ampoules are delivered by the manufacturer of the breathalyzer machine for exclusive use in such machine plus the additional fact of regular spot checking of the ampoules is, in our opinion, sufficient *prima facie* proof that the chemicals in any one ampoule are of the proper kind and mixed to the proper proportion.[6]

To assure the reliability of the results of the breathalyzer test admitted into evidence, there has been a basic adherence to the foundational requirements of *Baker* in many jurisdictions. Frequently, there has been state legislation assigning to the state board of health or state toxicologist the duty of training and certifying the breathalyzer operators and testing and certifying periodically the component chemicals and machines.[7]

In the instant case, the failure of the testing officer to record the number of the machine and ampoules was not a mere technicality. His action made it impossible to establish two of the foundational requirements necessary to permit the result of the breathalyzer test into evidence, viz., that the machine was properly checked and in proper working order at the *time* of conducting the test; and that the chemicals employed were of the correct kind and compounded in the proper proportions. Under such circumstances, the reliability of the test result could not be established, and the court erred admitting the result into evidence. Since the court ruled that defendant's conviction was based on the total findings set forth by the court, and one of the findings was the result of the breathalyzer test, the admission of the evidence constituted prejudicial error.

WILKINS, J., concurs in the dissenting opinion of MAUGHAN, J.

---

6. at p. 811 of 355 P.2d; also see *State v. Miller*, N.D., 146 N.W.2d 159 (1966); *State v. Rines*, Maine, 269 A.2d 9 (1970).

7. *State v. Ghylin*, N.D., 222 N.W.2d 864 (1974); *Marcum v. Commonwealth*, Kentucky, 483 S.W.2d 122 (1972); *People v. Donaldson*, 36 A.D.2d 37, 319 N.Y.S.2d 172 (1971); *Penny v. State*, Okl.Cr., 410 P.2d 553 (1966); *Wester v. State*, Alaska, 528 P.2d 1179 (1974); *State v. City Court of City of Tucson*, 15 Ariz.App. 229, 487 P.2d 766 (1971); *State v. Paul*, Mo.App., 437 S.W.2d 98 (1969); *State v. Hood*, 155 W.Va. 337, 184 S.E.2d 334 (1971); *State v. Kaser*, 15 Or.App. 411, 515 P.2d 1330 (1973); *State v. DeVito*, 125 N.J.Super. 478, 311 A.2d 753 (1973); *State v. Hall*, 39 Ohio App.2d 87, 315 N.E.2d 504 (1973); *State v. Jones*, La., 316 So.2d 100 (1975).