**Haskell William BRYANT, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

No. A–12333.

Criminal Court of Appeals of Oklahoma.

Oct. 17, 1956.

Floyd Walker, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Here Haskell William Bryant appeals from a conviction in the court of common pleas of Tulsa County where he was tried before a jury on a charge of driving a motor vehicle upon a public highway while under the influence of intoxicating liquor. The punishment assessed by the jury was ten days confinement in the county jail, and to pay a fine of $10.

For reversal it is urged, (1) That the court erred in admitting evidence relative to the persons injured in the involved accident, and (2) that the court erred in the admission of expert testimony.

For convenience we shall at this point summarize the evidence.

R. A. Pritchard, first witness for the State, a Tulsa resident, said that he first saw defendant the evening of October 1, 1955, about thirty minutes before dark. Witness said that he was driving his automobile east [on Thirty-sixth Street] approaching the intersection of Lewis Avenue when he noticed defendant go around him. He especially noticed him as he had a "bed and trailer on behind". This was about a hundred yards before coming to the intersection. He next noticed defendant's vehicle strike another car about six or eight feet in the intersection. He said there was a stop sign there, but that defendant failed to stop. He estimated defendant's speed at about 45 miles an hour. He said that after the collision he first went to defendant's car and defendant was sitting under the wheel. He said there were three people lying in the street. He was asked, "What did you do then?" He answered: "They were all piled up in just one big pile. I drove off the highway and tried to make them comfortable until we got the ambulance there." No objection was interposed to the answer.

Witness said that after about thirty minutes he was standing with an officer when defendant was questioned. He said there was a slight smell of alcohol on defendant's breath. And on cross-examination he said defendant told the officer he had drunk a couple or three beers. Witness did not have opportunity to observe defendant very much, and noticed no other irregularity.

C. D. Berry testified that he closed his automobile parts store right around six o'clock the evening of the accident in question, and was driving home, travelling north on Lewis Avenue, in his pickup. He was asked to tell what he observed at that place and time. Said he:

"Well, just as I was approaching the intersection I noticed a car coming from the north. I also noticed one coming from the west, and I just had the reaction there in my mind, 'The car from the west will stop at the stop

sign.' * * * Then I saw he wasn't going to stop and he hit the car going south and threw it into me."

He said that the defendant was the driver of the car going east, and that ran into the Gifford car which was going south on Lewis Avenue. He said that the Gifford car was pushed into his car, which at the time was about 15 feet south of the intersection on Lewis, and then went 100 feet south, and three people were thrown from that car and were lying on the pavement about 60 to 75 feet from the resting place of the car in which they had been riding. He further said that he asked the defendant to help stop the traffic; that a near-by resident phoned for an ambulance, and a highway patrolman got there just before the ambulance arrived.

On cross-examination this witness said that defendant did not particularly have the appearance of a man under the influence of intoxicating liquor, but that he did smell the odor of beer or something on him. Defense counsel elicited the information from this witness that defendant had paid him $280 to cover the damage to his car.

Jack Larmour, state highway patrolman, testified to investigating the motor accident at Thirty-sixth Street North, and North Lewis, Tulsa on the date in question. Said that he arrived at approximately 6:20 or 6:30. He said:

"All three cars were at the scene; one approximately a hundred to a hundred and fifty feet south of 36th Street North, one pick-up about fifteen feet north of the intersection; Mr. Bryant's car sitting pretty well across the highway, or across North Lewis, headed rather southeast, in a southeasterly direction; one person lying on the pavement covered with a quilt.

"Q. Now at the time that you arrived there, did you make an investigation of the facts involved in this case? A. Yes, sir, I did.

"Q. What did that investigation consist of? A. I found that Mr. Bry-

ant's car had struck Mr. Gifford's car on the right side and rear, knocking it into the pickup which was travelling north, and it continued on south on the road a short distance after this. Mr. Gifford, I believe, was thrown out of the car."

Witness further stated as to the Gifford car:

"It had been struck on the right side in the rear, the right rear, I would call it, by Mr. Bryant's car, which was travelling east, and knocked into the pickup that was travelling north, causing damage to the left rear of it."

This witness said the damage to defendant's car was in the front, and that when he questioned the defendant, "He made the statement to me that he run through the stop sign, he didn't see it, and that he had drunk two or three bottles of beer earlier in the afternoon."

Witness said that he observed defendant walk around the scene of the accident, and that he was unsteady on his feet; that he was very slow in answering questions, that "his tongue was a little thick and his eyes were a little bit blood shot and blurred;" and that there was an odor of alcohol about him and his person. After qualifying questions, witness gave it as his opinion from his observation of the defendant that he was under the influence of intoxicating liquor.

Witness said that later on at the sheriff's office at approximately 7 P.M., he gave defendant the intoximeter test. He identified kit No. 771. He described how the test was given; said the kit was then locked in a drawer at the sheriff's office and taken to the chemist the following day.

H. L. Spencer testified that he had been employed as chemist and biologist at the Medical Arts Laboratory, Tulsa, for ten years; that he had a Master's Degree from the University of Kansas; that he was familiar with the intoximeter test and had been analyzing the particular kind of kit involved in the within case for about five years. He said that he prepared a

certain amount of the kits for the Highway Patrol. He described, in detail, the preparation of the kits and the final test on return from the Highway Patrol. He made the analysis of defendant's breath sample, and found it tested .1636. Counsel for the defense objected to the evidence on the ground that no proper foundation had been laid for it; no proper predicate. The objection was overruled.

Dr. Wm. Van Pelt testified that he had spent four years at the University of Arkansas School of Medicine and was a graduate; that he was familiar with the study in connection with the effect of alcohol on the human system; that he was the city police physician and had been called on to study and to testify in cases in which the intoximeter was used, and was familiar with the standards set up by the American Medical Association on the effect of alcohol. He gave it as his opinion concerning the percentage of alcohol that it is necessary to be found in the blood before it can definitely be said that a person is intoxicated, as .15 per cent alcohol.

This completed the evidence for the State, and the court overruled a demurrer interposed by the defendant.

The defendant testified and delineated his movements from the early morning of Saturday, October 1, 1955, until the motor collision that afternoon just before dark. He admitted having drunk five cans and one glass of beer during the day, but he denied being intoxicated or having drunk any whiskey. He said that he just did not see the stop sign at Lewis Avenue and Thirty-sixth Street, and the first thing he knew he saw a car; that he put on his brakes but it was too late and he ran into the Gifford car.

Mr. Gifford, driver of the car defendant ran his pick-up into, testified, and said that at the time of the accident his wife and daughter were in his car with him, and that he was driving south on Lewis Avenue. At Thirty-sixth Street he observed a car coming from the west on Thirty-sixth Street, just an instant before it hit him,

that the impact drove his car into one coming from the south; that it was just before dark; that he and wife and daughter were thrown from the car onto the pavement and that he does not remember anything that occurred thereafter. That he and his family were removed to the hospital.

Counsel for the defendant then asked witness if his car was severely damaged and he answered in the affirmative. He was then asked, "You have been paid for your damages that you sustained?" The answer was, "That's right". Of course this evidence was not properly admissible, as it had no bearing on the guilt or innocence of the defendant of the crime charged. However, no objection was made, and after such a question is asked the damage is done, irrespective of the ruling of the court.

Robert K. Stackhouse, nephew of the defendant, testified and corroborated defendant as to his whereabouts for a good portion of the day in question, and remembered that between 12 o'clock noon and 5 P.M. they each drank four beers.

Considering defendant's proposition one, to the effect that the court erred in admitting evidence relative to the persons injured in the accident, we note that in one of his briefs counsel sums up his objection by the statement:

"In this case evidence as to the nature, type and extent of personal injuries sustained by the people involved in this accident is clearly prejudicial. The personal injuries sustained by these parties have absolutely no probative effect in so far as proving the defendant guilty of driving while intoxicated. The only purpose of such testimony was to create bias and prejudice against the defendant, in the minds of the jurors."

▪ From a careful examination of the evidence, and which we have summarized, we discover no evidence as to detailing the injuries of the three occupants of the Gifford car. Witnesses merely re-

cited what they observed just prior to and at the instant of the impact between defendant's car and the other two cars involved, and what they saw immediately afterwards. It was brought out that the impact was such that the Gifford car was driven into another car coming from the south and then went on 100 to 150 feet south and the three occupants of the car were thrown to the pavement at a point 60 to 75 feet from where the Gifford car came to rest. One witness saw to the calling of an ambulance and attempted to make the victims comfortable until the ambulance arrived.

The only objection to the question now complained of that we discover in the record came in the form of a motion to strike the testimony of one witness for the State, C. D. Berry, who was the driver of the car coming from the south on Lewis Avenue, and whose car was damaged by the impact of the Gifford car, which was pushed into his car by reason of the impact from defendant's car.

█ Counsel for the defendant elicited from this witness the fact that the defendant had paid witness for his damages, which line of examination was improper, and from the very minimum penalty assessed the defendant was evidently very effective in prejudicing the jury in favor of letting his client off lightly irrespective of the question of intoxication. We therefore do not find substance in proposition one.

In his second specification of error, defendant contends that the court erred in the admission of expert testimony. Counsel contends that under the statement announced in Riddle v. State, Okl.Cr., 288 P.2d 761, wherein the Texas case of Hill v. State, 158 Tex.Cr.R. 313, 256 S.W.2d 93, is cited with approval, that the qualifications of Homer L. Spencer, chemist and biologist, employed in the Medical Arts Laboratory at Tulsa, were not established.

█ The State showed that Mr. Spencer was the holder of a Master's Degree from the University of Kansas, that he had been employed ten years in the Medical Arts Laboratory, Tulsa, as chemist and biologist, and that he had five years experience in the handling of the intoximeter kits and tests involved. In fact, he said that he personally prepared the kit here involved, for the Highway Patrol.

Counsel argues:

"Homer L. Spencer was incompetent to testify as to the relationship between the amount of alcohol found to exist in the breath sample, and the amount or percentage that might be present in the blood. Mr. Spencer was not competent to testify as to the amount of alcohol contained in the blood of the defendant upon the basis of having examined a breath sample. * * * In this case it is improper for a chemist to use an 'empirical formula' prepared by others—it likewise is hearsay. The vice inherent in the use of a 'chart' [mentioned in Riddle v. State, supra] is likewise present in the use of an 'empirical formula'."

This argument is based on the following examination of witness Spencer by counsel for the defendant:

"Q. Now, Mr. Spencer, I want to ask you some other questions here concerning the test. There is no blood samples connected with taking that test at all? A. No.

"Q. If you take a little sample of blood and run a test on it would it show the alcoholic contents, or could you do a qualitative analysis of the blood? A. I do that all of the time.

"Q. To determine the amount of alcohol? A. Yes, sir.

"Q. You say that the amount of alcohol in the breath has a relationship to the amount that might be contained in the blood? A. That's right.

"Q. How is that relationship determined? A. It has been established—

"Q. Just a minute. I don't believe that will be quite responsive to the

question. I asked you how it is determined? A. *By calculation.* [Emphasis supplied.]

"Q. Do you determine it just in conjunction with this test? A. That's right.

"Q. I would like to know how you determine the relationship of alcohol in a breath sample and the amount that may be in a person's blood stream? A. We determine the amount of alcohol in the total sample in grams; in this case it is .0025 grams.

"Q. That is the amount? A. That is the total amount of alcohol in this particular sample.

"Q. Yes sir. A. We multiply that by .2; that is, .2 of 200 milligrams is .2 of a gram.

"Q. May I ask you why you multiply by .2? A. Yes. .2 is a figure that has been correlated; that is a figure for the weight of the breath. It is 200 milligrams, or .2 of a gram. It has been determined that the alcohol associated with that stated in grams is equivalent to the mathematical expression of the percentage of alcohol in the blood stream.

"Q. Did you ever determine that yourself? A. That is an empirical formula which I had; that is just a formula.

"Q. You just read it out of a book or something? A. That is just a formula that has been taken; that is not my own determination, as such, in so far as I have checked on the same individual, blood alcohol and one of these tests; at the same time, *I have confirmed in my own mind that the thing works.* [Emphasis supplied.]

"Q. Have you ever made the test, or did you make the test in this particular case, to correlate the amount of alcohol that you found existing in this test, and the particular breath sample and the particular percentage, to

determine what effect that would have on a blood sample that was taken? A. By formula only."

Steadman's Medical Dictionary defines empirical as meaning, "Founded on experience"; and Webster's New International Dictionary says: "Pertaining to or founded upon, experiment or experience; depending upon the observation of phenomena. * * * Empirical formula, Chem. See formula—a law." Under "Formula" it is said: "A chemical formula may express merely the results of a quantitative analysis, as in the empirical, * *."

As we understand the matter, using a simple illustration, it is a scientific fact, for example, established by long experiment, that water is made up of two gases, hydrogen and oxygen, which when combined in the proportion two parts hydrogen plus one part oxygen results in a liquid, water, expressed $H_2O$. As a layman without scientific experience in the field of chemistry one would accept the formula as true and might not be competent to testify concerning how the formula might be derived, or whether it was correct. But not so as to an expert witness.

In the Hill case from Texas, 256 S.W.2d 93, 95, it was said:

"The witness readily admitted that he did not understand the formula for such calculation and translation and relied entirely upon a chart which came with the machine. Insofar as it established an evidentiary fact, such chart was clearly hearsay. *If, on the other hand, the witness had been able to withstand cross-examination on the formula, then he would be an expert witness; and the question of hearsay would have passed out of the case* under the doctrine that reference by an expert to a known authority to support his opinion does not constitute an introduction of the medical textbook or authority as original evidence." [Emphasis supplied.]

The chemist, Mr. Spencer, said that he had confirmed the formula in his own mind. The long and exhaustive examination developed nothing in the opinion of this court to discredit or weaken the opinion of this witness that the breath sample of the defendant showed a percentage of alcohol in the blood stream of defendant of .16.

■ The court properly instructed the jury concerning expert testimony as follows:

"There has been introduced the testimony of certain witnesses who purport to be skilled in their line of endeavor. Such witnesses are known in law as expert witnesses. An expert witness is one who is skilled in any certain art, business or profession, possessed of peculiar knowledge acquired by study, observation and practice.

"You are instructed that you may consider the testimony of these witnesses, and give it such weight and value as you think it should have, but the weight and value to be given their testimony is for you to determine. You are not required to surrender your own judgment to that of any person testifying as an expert, or to give controlling effect to the opinion of an expert, for the testimony of an expert, like that of any other witness, is to be received by you and given such weight and value as you deem it is entitled to receive."

The small amount of punishment assessed certainly indicates that the jury gave defendant the benefit of every doubt.

The judgment appealed from is affirmed.

JONES, P. J., and BRETT, J., concur.