Sarah E. ALEXANDER, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant In Error.

No. A–12355.

Criminal Court of Appeals of Oklahoma.

Dec. 12, 1956.

A. A. Berringer, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst Atty. Gen., for defendant in error.

POWELL, Judge.

Plaintiff in error, Sarah E. Alexander, hereinafter referred to as defendant, was tried before a jury in the municipal criminal court of Tulsa of the crime of driving a motor vehicle upon a public highway while under the influence of intoxicating liquor, was found guilty, but the jury being unable to agree upon the penalty left that to the court, who fixed punishment at imprisonment in the Tulsa County jail for ten days, and a fine of $100. Appeal has been duly perfected to this court.

For reversal it is urged, among other things, that "The court erred in admitting in evidence testimony of officers about statements or admissions and tests of defendant which were not given or submitted to voluntarily."

This proposition is a very important issue in the within appeal, because as we view the record, if the evidence with reference to certain physical tests, statements defendant made and that were taken down by an officer, and a breath test for alcohol were involuntary and if therefore inadmissible in evidence, then it is very doubtful that there was sufficient evidence to have caused conviction, and defendant would be entitled to a new trial.

■■ The problem then is to first determine if the tests and statements in question were voluntarily or involuntarily entered into. And as a guide in making this determination the rules set out in Lyons v. State, 77 Okl.Cr. 197, 138 P.2d 142,

144, 140 P.2d 248; Id., 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481, should be kept in mind. There we said:

"A voluntary confession is one made by an accused freely and voluntarily, without duress, fear or compulsion in its inducement, and with full knowledge of the nature and consequences of the confession.

"A confession of the accused shown not to have been freely and voluntarily made, but induced by hope or promise of benefit, or *through fear,* or by personal violence and torture, or threats thereof, except to the extent that it may in some instances be used to impeach the testimony of the accused, is involuntary and inadmissible." (Emphasis now supplied.)

We note that after the jury had been selected, but prior to the commencement of the trial, counsel for defendant contended that certain evidence relied upon by the state was inadmissible, and the jury was excused so that the court might hear and pass on the admissibility or inadmissibility of the evidence complained of. See Lyons v. State, supra. Such is also the procedure where evidence is claimed to have been obtained by unlawful search and seizure. Watson v. State, 73 Okl.Cr. 58, 117 P.2d 808.

The hearing was in the nature of a hearing on a motion to suppress, though the reporter in brackets designated the same, "Hearing on the admissibility of certain extra-judicial confession." In this hearing there was no evidence of admissions of statements made by the accused. The evidence covered "real" rather than written or testimonial.

In Bowden v. State, 1952, 95 Okl.Cr. 382, 246 P.2d 427, 428, this court held:

"Whether accused voluntarily furnished samples of blood and urine for analysis is a preliminary question for trial court."

Not only was a rule of procedure indicated, but the inference from the above quotation is that if the proof would show

the blood or urine specimen was involuntarily given, then it would be inadmissible in evidence. But the court in the Bowden case found that the specimens were voluntarily given, so that any inference as to a ruling in case of specimens not voluntarily given would constitute dicta.

The defense used but one witness, the defendant, and the State failed to introduce any evidence to rebut that of the defendant.

If the State had introduced rebuttal evidence the problem would be simply to discover if there was competent evidence to support the finding of the court. We would not seek to determine the weight of the evidence. Griffin v. State, 90 Okl.Cr. 90, 210 P.2d 671.

Our first task, then, is simply to determine from the evidence whether the defendant was caused to involuntarily give evidence against ·herself to the police and officials who took her into custody.

Defendant testified that on October 5, 1955, at approximately 7:50 P.M. she was arrested at Fourth and Main Streets, in the City of Tulsa. (She had made an unauthorized left-hand turn.) She was taken to the police station and into a room where she was told to walk a line, to pick up some coins, and caused to perform other manual tests. Witness said that she was under arrest and that she thought she had to do everything the officers told her to do. That they refused to permit her to make a 'phone call for advice; that she was not advised as to her constitutional right to counsel and to refuse to do the things demanded, and did not know and was not advised that this evidence could be used against her.

Defendant denied on cross-examination that she performed the manual tests and blew her breath into a balloon voluntarily. She said that Officer Haddock told her to sit down in a chair, handed her a balloon and told her to blow it up. She said that she thought she needed counsel if she was under arrest. She reiterated that she was never advised that she had a right, if she did, to refuse to do the things demanded.

From the facts stated, standing alone, can it be said that this woman, presumably inexperienced in legal procedure and the duties and authority of police officers, performed the manual tests and gave her breath for an alcohol test, willingly? She says not. If the State was prepared to take issue with the contentions of the accused it would have been a simple matter, and it was the duty of the prosecution, to have introduced evidence to the contrary. The accused's evidence, though not entirely satisfactory and free from doubt in establishing her contention, could not simply be brushed off as of no consequence.

■ ■ It is true that in the trial an attempt was made to take issue with the evidence of accused given on the hearing that was held out of the presence of the jury at the commencement of the trial. The court there was trying to determine, under conditions free from the possibility of prejudicing the jury, the admissibility of the evidence then and now complained of. For the purpose of the ruling on the motion to suppress we cannot give consideration to matters developed during the course of the trial indicating that the accused gave the breath specimen and entered into the manual tests without objection. In the interest of orderly procedure and giving the unrefuted evidence of the defendant full credence by reason of the very fact that it was not denied, we must hold that defendant's manual demonstrations, including the breath test for alcohol, were not freely entered into by the defendant, but were performed by reason of fear engendered by the rigid and compelling demands and requirements of the police, supported by an apparent finality of authority and power, even though no force was used, and no threats made.

Having determined that the evidence by way of manual tests and breath test for alcohol were in effect compulsory, still, was the action of the trial court in refusing to suppress such evidence a denial to the defendant of her privilege against self-incrimination guaranteed by

Art. II, § 21 of the Oklahoma Constitution? [1]

As has been found from the case of Lyons v. State, supra, this court has long been committed to the rule that where the evidence in question was verbal, as where a confession or an admission against interest was involved, that the confession or admission must have been voluntary.

But appellate courts of many of the states recognize a distinction between oral evidence and evidence procured by demontration by acts which tend to self-incrimination. They follow the principle enunciated by Wigmore in Vol. VIII of his work on evidence, 3d Ed. § 2263, where he notes that the privilege against self-incrimination was established in the common law to protect the individual against "The employment of legal process to *extract from the person's own lips* an admission of his guilt." [2]

Research indicates that most, if not all, of the states of the Union have constitutional provisions similar to the Fifth Amendment to the United States Constitution, and therefore similar to our provision against self-incrimination. The cases are uniform in holding inadmissible self-incriminating words forced from the lips of an accused or forced incriminating writings, but the decisions are not uniform as to evidence obtained by use of bodily fluids of an accused gotten either while he was unconscious or at a time when he was conscious but against his will. Likewise as to other forms of physical evidence. [3]

While we do not find that this court, where it was a proper issue, has ever been called upon to pass squarely on the question of the admissibility or inadmissibility of compulsory manual tests and breath tests for alcohol, we shall survey cases from this court having a bearing on the question.

In the early case of Ricketts v. State, 1923, 23 Okl.Cr. 267, 215 P. 212 (citing Alabama, Georgia and Montana cases), this court through Judge Doyle quoted at length from Wigmore's work on evidence [4] to support the court in holding that the forcible taking of footprints did not violate defendant's constitutional right not to be compelled to give evidence against himself. The article is too lengthy to repeat here. But the Wigmore rule would hold admissible all manner of "real" or "physical" evidence gained from a forced observation, as will later be illustrated by cases from jurisdictions so holding. The question arises as to what is the reason for the rule that distinguishes between "oral" and "physical". evidence. From the textbooks and cases the distinction between evidence elicited from the lips of an accused or by writings made is this: That where such evidence is given either in fear of punishment or in hope of escaping punishment, it is not received as evidence because experience shows that the accused is liable to be influenced by these motives, and such evidence cannot be relied on as guides to truth. But it is said that this objection will not apply to evidence of the nature complained of in the within case, because no hopes or fears of the accused could change one iota the physical facts. And by that is meant such things as accused's foot-prints, bodily scars, a bald head, walking a straight line, his finger prints, size of hat, how he

1. Art. II, § 21, Okl.Const.: "No person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided; * * *."

2. See comparable statements in 1 Greenleaf on Evidence, 16th Ed., § 469e, Self-Crimination; Ibau: Self-Incrimination—What Can An Accused Person Be Compelled to Do? 28 J.Crim.L. 261.

3. See 127 A.L.R. 1514, note; 159 A.L.R. 216, note; 164 A.L.R. 972 note; 171

A.L.R. 1138, note; 18 A.L.R.2d 796, note; 25 A.L.R.2d, note, and A.L.R.Supp. Service, Vols. 1–44 2d; 58 Am.Jur., Witnesses, § 61. See also Okl.Law Rev. May, 1953, Vol. 6, pp. 194–205, article by James K. Schooler, Esq., Criminal Law; Admissibility of Compulsory Chemical Tests to Determine Intoxication; 5 A Am.Jur., Automobiles, § 1249, Compulsory Tests and Examinations.

4. See Wigmore's Work on Evidence, 3d Ed., §§ 2263, 2265, 2266.

would look with glasses on, etc. And it is our thought that this analogy must be accurate in spite of the problem connected with the proof of the extent of concentration of alcohol in the blood, though comparable problems would not exist in the illustrations of real evidence stated.

The Ricketts case has been adhered to in Nowlin v. State, 1938, 65 Okl.Cr. 165, 83 P.2d 601, and in Payne v. State, 1952, 95 Okl.Cr. 117, 239 P.2d 801.

In Ward v. State, 1924, 27 Okl.Cr. 362, 228 P. 498, 499,[5] the Ricketts case is not mentioned, but the Ward case to a degree departed from the Wigmore rule that would restrict the prohibition to oral evidence and written confessions. One of the appellants (Noble) was a witness in his own behalf and during his cross-examination the county attorney handed the witness a coat and asked him to put it on. Appellant objected, and the court overruled the objection and required him to put on the coat in the presence of the jury. After appellant had placed the coat on his person, the county attorney remarked, " 'The coat found at the still fits the defendant like the paper on the wall.' " This court held that the action of the trial court in requiring the defendant when a witness to put the coat on in the presence of the jury violated his constitutional right not to give incriminating evidence against himself. In the body of the opinion Judge Matson said:

"The right intended to be provided [protected] by the constitutional provision that no person shall be compelled to give evidence which will tend to incriminate him is so sacred, and the pressure towards its relaxation so great when the suspicion of guilt is strong and the evidence weak and obscure, that it is the duty of the courts liberally to construe the prohibition in favor of personal rights, and to refuse to permit any steps tending toward their invasion.

"While the decisions do not appear to be altogether in accord on this subject, we think a clear distinction should be made between the defendant as such and between the defendant as a witness. The prohibition was intended for the protection of witnesses, and as such it should receive a more liberal construction in favor of witnesses. The difference is this, that when such comparisons and experiments are made outside of court, the evidence thereto falls from the lips of witnesses other than the defendant. The production of such evidence, therefore, and the testimony thereto, is not that of defendant but of other witnesses; while, on the other hand, if the defendant is required against his objection in open court, in the presence of the jury, to make such experiments and comparisons, no extraneous evidence is required, and the constitutional prohibition is thereby violated. Certainly it is against the spirit of this prohibition to compel this defendant in open court and in the presence of the jury to put on a coat which will serve directly to connect him with the commission of the crime."

Cited in the Ward case as one of the authorities for the holding was Gillespie v. State, 1911, 5 Okl.Cr. 546, 115 P. 620, 35 L.R.A.,N.S., 1171, where it was held that to require a defendant in the presence of the jury to produce a paper or document referred to containing incriminating evidence against him, was a violation of the immunity secured to him by section 21 of Article 2 of the Oklahoma Constitution, even though no order for the production of the paper was made. The court relied on the case of McKnight v. United States, 6 Cir., 115 F. 972, 54 C.C.A. 358, and Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.[6]

In Ex parte Fowler, 1947, 85 Okl.Cr. 64, 184 P.2d 814, and Ex parte Woodruff,

5. See 171 A.L.R. 1176, note.

6. See also Thomas v. State, 1926, 34 Okl. Cr. 63, 244 P. 1116; Crump v. State,

1912, 7 Okl.Cr. 535, 124 P. 632; Chambless v. State, 1951, 94 Okl.Cr. 140, 231 P.2d 711; Temple v. State, 1918, 15 Okl.

1949, 90 Okl.Cr. 59, 210 P.2d 191, this court has held that under 63 O.S.Supp. (1947) § 548, a person arrested either by warrant or without a warrant, who is thereafter convicted in a police or municipal court for a sex offense, may be held for the purpose of determining if such person is infected with venereal disease. Neither a fact question as to the actual infection of the respective accused nor any other issue involving the physical examination, was before the court. There was simply at issue the question of the proper exercise of police power by the Legislature to prevent the introduction and spread of infections and contagious disease.

In Hinkefent v. State, Okl.Cr., 267 P.2d 617, 619, in which the Ricketts and some other cases from this court are cited, the accused had willingly submitted to the intoximeter test for alcoholic content of his blood, but on appeal to this court it was contended that defendant's constitutional rights had been violated in that defendant in effect was tricked into taking the intoximeter test because a promise had been made by the officer that no charge would be filed if the intoximeter test was favorable to the defendant; that this constituted a ruse and rendered the results of the test inadmissible in evidence. This court held that evidence secured by the drunkometer test, blood test, or urinary test as to percentage of alcohol present in the human system was comparable to scientific tests for identity by fingerprints or footprints. In that opinion there was further thrown in for what it was worth the statement:

"Though the statement was apparently dicta, this court in Turvey v. State, [95 Okl.Cr. 418] 247 P.2d 304, 307, states: 'The court should not ad-

Cr. 146, 175 P. 555; Montgomery v. State, 1917, 13 Okl.Cr. 652, 166 P. 446; Burnett v. State, 8 Okl.Cr. 639, 129 P. 1110, 47 L.R.A.,N.S., 1175. But see Wigmore on Evidence, 3d Ed., § 2264(2), where it is said: "It follows, on the other hand, that documents or chattels obtained from ·the person's control *without the use of process against him*

mit evidence of defendant's intoxication where such tests were given over objection of accused.' Cited was the case of Apodaca v. State [1941], 140 Tex.Cr.R. 593, 146 S.W.2d 381'."

We did not find that defendant was tricked into submitting to the intoximeter test, but in effect found that the test was willingly submitted to. See in this connection Lombness v. State, 95 Okl.Cr. 214, 243 P.2d 389.

In Hinkefent we cited the case of Holt v. United States, 1910, 218 U.S. 245, 252, 253, 31 S.Ct. 2, 6, 54 L.Ed. 1021, 20 Ann. Cas. 1138. The Holt case is distinguishable from Ward v. State, supra, from this court. In the Holt case as in the Ward case the question was whether a certain blouse belonged to the prisoner. A witness testified that Holt put it on and it fitted him. While it is true that the prisoner was required or compelled to put on the blouse, the demonstration was out of the presence of the jury. We called attention to the statement of Justice Holmes in the body of the opinion in the Holt case where he said:

"But the prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material."

We noted in our opinion: "But we are not called upon to approve a rule as broad as that stated by Justice Holmes." For clarity as to what was meant, we would say that in Hinkefent all we were required to pass on was whether the evidence supported the trial court's finding that the defendant was not tricked into submitting to the intoximeter test, and we were not required

*as a witness* are not in the scope of the privilege, and may be used evidentially; for obviously the proof of their authenticity, or other circumstances affecting them, may and must be made by the testimony of other persons, without any employment of the accused's oath or testimonial responsibility."

to pass on whether or not the constitutional inhibition against self-incrimination was limited and restricted to "words from the lips" and writings, and had no application to the real or physical evidence as had been indicated in the Ricketts case but as had been broadened in the Ward case.

We find in the recent case of Barnhart v. State, Okl.Cr.1956, 302 P.2d 793, 795, that on appeal it was contended, among other things, that it was error to permit the officers to testify to defendant's refusal to take the intoximeter test.[7] Judge Brett said:

"This contention, as an abstraction, has considerable merit and we shall pass upon the matter when it is properly presented. But, irrespective of the merit to the contention, as an abstract proposition, that question, herein, has not been properly preserved and the proper predicate does not exist for passing on the matter at this time. In fact, the privilege against self incrimination in the case at bar has been waived."

Further on in the opinion it is stated:

"We are of the opinion that the procedure in the record as made by the state creates no infringement of the defendant's constitutional right against self incrimination. *He had refused to take the test as was his right so to do. He had the right under the law to stand on that refusal.*"

Cited was Toms v. State, 95 Okl.Cr. 60, 239 P.2d 812. But in the Toms case the breath and urine tests for alcoholic content of the blood were entered into freely, so the expression quoted also constituted dicta.

In Taylor v. State, 90 Okl.Cr. 283, 213 P.2d 588, a case where defendant was prosecuted in Muskogee County on a charge of grand larceny by stealing a diamond ring, the evidence indicated a scheme or plan to rob a number of stores during the same tour of several counties, and there was evidence that the defendant and an accomplice, Giles, stole two diamond rings in another county (Garfield). After the arrest of Taylor and Giles, the price tags were found in Taylor's car, and X-ray pictures were made of the stomachs of both Taylor and accomplice Giles, and showed two rings in Giles' stomach. The pictures were admitted in evidence in Taylor's trial for the Muskogee County theft, as corroborative evidence of the scheme and plan of operation of defendant and Giles. The matter of the constitutional provision against self-incrimination was not an issue and is not mentioned in the opinion.

Appellate courts other than Oklahoma, as has already been indicated in the footnotes, have passed on the question under consideration many times. By reference to the digests and text books that we have cited it will be seen that the comparable constitutional provision against self-incrimination has been held not to afford protection against compulsory physical exam-

---

7. See Oklahoma statutory provision, 22 O.S.1951 § 701, reading: "In the trial of all indictments, informations, complaints and other proceedings against persons charged with the commission of a crime, offense or misdemeanor before any court or committing magistrate in this State, the person charged shall at his own request, but not otherwise, be a competent witness, and his failure to make such request shall not create any presumption against him nor be mentioned on the trial; if commented upon by counsel it shall be ground for a new trial." See also Bell v. State, 1934, 55 Okl.Cr. 439, 32 P.2d 747; Shelton v. State, 1931, 49 Okl.Cr. 430, 295 P. 240; Zedda v. State, 1925, 30 Okl.Cr.

348, 235 P. 939; Shepherd v. State, 1943, 77 Okl.Cr. 131, 139 P.2d 605. Some states have statutory or constitutional provisions to the contrary, whereas other states do not appear to have the matter covered by either such provision. See typical cases: State v. Benson, 1941, 230 Iowa 1168, 300 N.W. 275. No statutory provision mentioned. And State v. Nutt, 78 Ohio App. 336, 65 N.E.2d 675. The Ohio constitution, Art. I, § 10, provides: "No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be made the subject of comment by counsel."

ination. That is, the following has been held permissible: taking fingerprints under compulsion[8], the measuring of shoes and feet[9], the examination of the defendant for identifying scars, marks, or wounds[10], compelling defendant to speak for voice identification[11], to display himself in certain clothes[12], to dye his hair[13], to stand during trial for better identification[14], and to unwrap a bandaged hand alleged to be burned[15], and where defendant had grown a beard between the time of arrest and time of trial, the prosecution was permitted to introduce into evidence a photograph taken immediately after arrest[16]. For other illustrations see cases cited in 58 Am.Jur. § 67, Witnesses; 5A Am.Jur., §§ 1248, 1249 and 1250, Automobiles.

We find the case of State v. Cram, 176 Or. 577, 160 P.2d 283, 164 A.L.R. 952, to be a well-considered case. There it is flatly held:

> "Admission of testimony concerning alcoholic contents of blood sample compulsorily taken from automobile driver following accident and at time when he was unconscious and under arrest, in subsequent prosecution for manslaughter based on death as a result of such accident, was not violation of defendant's constitutional privilege against self-incrimination."

Cases from various courts pro and con on the subject are reviewed. Chief Justice Belt also in a well-considered opinion of dissent concluded that the constitutional right of the defendant against self-incrimination was violated. For a general survey of the subject it would be profitable to study this case together with. the annotation commencing at page 967 of 164 A.L.R., following the reported case.

Other typical and instructive cases holding with the view expressed in the Cram case are State v. Alexander, 1951, 7 N.J. 585, 83 A.2d 441, and State v. Smith, 8 Terry 334, 47 Del. 334, 91 A.2d 188; Vigil v. People, Colo., 300 P.2d 545; Twining v. State of New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed 97; Block v. People, 1951, 125 Colo. 36, 240 P.2d 512; Allen v. State, 1944, 183 Md. 603, 39 A.2d 820, 171 A.L.R. 1138; Davis v. State, 1948, 189 Md. 640, 57 A.2d 289; Green Lake County v. Domes, 1948, 247 Wis. 90, 18 N.W.2d 348, 159 A.L.R. 204; City of Barron v. Covey, 1955, 271 Wis. 10, 72 N.W.2d 387; State v. Sturtevant, 1950, 96 N.H. 99, 70 A.2d 909; Commonwealth v. Statti, 1950, 166 Pa.Super. 577, 73 A.2d 688; Kallnbach v. People, 1952, 125 Colo. 144, 242 P.2d 222; People v. Haeussler, 1953, 41 Cal.2d 252, 260 P.2d 8.

Of particular interest is a fairly late case from the Supreme Court of the United States and being Rochin v. People of Cal-

8. United States v. Kelly, 2 Cir., 1923, 55 F.2d 67, 83 A.L.R. 122; Shannon v. State, 1944, 207 Ark. 658, 182 S.W.2d 384; People v. Jones, 1931, 112 Cal. App. 68, 296 P. 317; McGovern v. Van Riper, Err. & App.1946, 137 N.J.Eq. 548, 45 A.2d 842; People v. Sallow, Gen. Sess.1917, 100 Misc. 447, 165 N.Y.S. 915; Owensby v. Morris, Tex.Civ.App. 1935, 79 S.W.2d 934; McGarry v. State, 1918, 82 Tex.Cr.R. 597, 200 S.W. 527.

9. State v. Smith, 1925, 133 S.C. 291, 130 S.E. 884.

10. State v. Oschoa, 1926, 49 Nev. 194, 242 P. 582; State v. Ah Chuey, 1879, 14 Nev. 79.

11. Commonwealth v. Valeroso, 1932, 273 Pa. 213, 116, 828; Johnson v. Commonwealth, 1886, 115 Pa. 369, 9 A. 78.

12. Holt v. United States, 1910, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; State v. Oschoa, 1926, 49 Nev. 194, 242 P. 582.

13. Smith v. United States, 1930, 88 U.S. App.D.C. 80, 187 F.2d 192, certiorari denied, 1951, 341 U.S. 927, 71 S.Ct. 792, 95 L.Ed. 1358.

14. People v. Clark, 1941, 18 Cal.2d 449, 116 P.2d 56; State v. Vincent, 1943, 222 N.C. 543, 23 S.E.2d 832; Rutherford v. State, 1938, 135 Tex.Cr.R. 530, 121 S.W.2d 342.

15. State v. Garrett, 1874, 71 N.C. 85.

16. Shaffer v. United States, 1904, 24 App. D.C. 417, certiorari denied 1905, 196 U.S. 639, 25 S.Ct. 795, 49 L.Ed. 631.

ifornia, 1952, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396. A new element is injected into the problem of the propriety of the use in a criminal case of "real" evidence secured by a forced physical examination of the accused. As pointed out in the note following the case in 25 A.L.R. 2d at page 1411:

"The standards of due process embodied in the Fourteenth Amendment were held [in Rochin v. People of California] to require the reversal of a conviction obtained by reliance upon evidence of capsules containing narcotics which state officers observed the accused swallow after they illegally forced their way into his room, and which they recovered by forcibly carrying him to a hospital and pumping his stomach against his will. Speaking for a six-judge majority (Minton, J., not participating), Justice Frankfurter said that due process of law was not heedless of the means by which evidence was obtained, rejected, in this connection, the distinction between 'real' and 'verbal' evidence, and concluded that the conduct shown did more than offend 'fastidious squeamishness or private sentimentalism', amounting to methods shocking to the judicial conscience, offending even hardened sensibilities and 'too close to the rack and the screw to permit of constitutional differentiation.'"

Justices Black and Douglas wrote concurring opinions, but they would have invoked the Fifth Amendment to the Constitution of the United States, and made it applicable against the States. However, a long line of cases from that court prevented that. The first ten amendments to the Federal Constitution were limitations on Federal power, and did not apply to the States. Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223.

Justice Douglas, in his concurring opinion in the Rochin case, said:

"But I think that words taken from his lips, capsules taken from his stomach, blood taken from his veins are all inadmissible provided they are taken from him without his consent. They are inadmissable because of the command of the Fifth Amendment." [342 U.S. 165, 72 S.Ct. 213.]

But he said that he thought the only states which would probably exclude the evidence would be Arkansas, Iowa, Michigan and Missouri. He gave citations. He could have added Texas, in view of Apodaca v. State, supra. But see Ash v. State, 139 Tex.Cr. 420, 141 S.W.2d 341.

We conclude as has the Supreme Court of Wisconsin [17] that the majority opinion in the Rochin case was not based upon any principle of denial of due process to the accused because the admission of the evidence as to the contents of his stomach constituted self-incrimination, but rather, that the brutality of the police officers in exerting physical force to obtain such evidence was "conduct that shocks the conscience."

The latest case that we find and which is exactly in point is that of Vigil v. People, Colo., Aug. 1956, 300 P.2d 545, where a woman and her son had been robbed by three armed men, two of whom had white cloths over their faces concealing all but their eyes and foreheads. The victims identified the robbers first in a police "lineup" in Denver, later from pictures of the two men and in the court room at the time of the trial. It appears that the court permitted masks to be placed over the faces of two of the men at trial of the case and this was assigned as error. It was held that the constitutional provision against self-incrimination is limited to protection against testimonial compulsion, and does not extend to the exclusion of the body as evidence when such evidence may be relevant and material.

This brings us back to the Texas case of Apodaca v. State, supra, 140 Tex.Cr.R. 593, 146 S.W.2d 381, that we so cited in

17. City of Barron v. Covey, 271 Wis. 10, 72 N.W.2d 387.

the case of Turvey v. State, supra, 95 Okl. Cr. 418, 247 P.2d 304, 307, and mentioned in our Hinkefent case, supra, Okl.Cr., 267 P.2d 617, 619. That case, Apodaca v. State, that we so easily approved by dicta holds:

"Demonstration by an act which tends to 'self-incrimination' is as obnoxious to the constitutional provision that one accused of crime shall not be compelled to give evidence against himself, as self-incrimination by words." [140 Tex.Cr.R. 593, 146 S.W.2d 381.]

As authority for the rule of law announced in Apodaca the author cites only general statements from digests [18] that if read beyond the portions quoted and the cases cited thereunder are studied, give scant comfort, because, as we have already pointed out, the reason for the inhibition as to involuntary words from the mouth and involuntary writings are not present in the case of physical evidence, and as Judge Doyle long ago pointed out by quotations from Wigmore in the Ricketts case in which the historical background of the rule is set out.

The Texas Court of Criminal Appeals has not since overruled Apodaca, but has several times distinguished it.[19]

In Coleman v. State, 1948, 151 Tex.Cr. R. 582, 209 S.W.2d 925, the same court held that fingernail scrapings could be taken from under defendant's finger nails for comparison with tissue from the body of the victim; and in Richardson v. State, 1954, 159 Tex.Cr.R. 595, 266 S.W.2d 129, held that admission of doctor's testimony as to the examination of defendant's tongue, in rape case in which prosecutrix testified that she had bitten assailant's tongue, did not violate self-incrimination privilege. In Henson v. State, 1953, 159 Tex.Cr.R. 647, 266 S.W.2d 864, the court held that admission of evidence obtained from application of paraffin to defendant's hands, to determine whether he had recently fired a gun or pistol, did not violate self-incrimination privilege. Also in Brown v. State, 1951, 156 Tex.Cr.R. 144, 240 S.W.2d 310, the court decided that the provision of the Texas statute requiring that an accused be appraised of his constitutional rights before a confession is made has no application to the obtaining of his consent for blood to be taken for the purpose of analysis. And prior to the Apodaca case, the Texas court of Criminal Appeals held in Ash v. State, supra, 1940, 139 Tex.Cr.R. 420, 141 S.W.2d 341, that in a case where the officers saw a defendant put something metallic in his mouth, when they were endeavoring to find some stolen rings, they had a right to take the defendant to the hospital and on discovering a ring or rings through fluoroscope it was permissible for them to give him an enema to recover the rings and then use the rings in evidence. Also in Rutherford v. State, 1938, 135 Tex.Cr.R. 530, 121 S.W.2d 342, the Texas court held in burglary prosecution, requiring accused to remove his glasses and stand up so that he could be viewed by witnesses was not objectionable as requiring accused to give evidence against himself, since witness had a right to view the accused and be positive in his identification.

The situation in Texas where the court in Apodaca departed from the standards set forth by Wigmore and Greenleaf and declared by the Supreme Court of the United States in 1910 in the case of Holt v. United States, supra, illustrates the difficulty courts encounter and the hairsplitting distinctions necessary to resort to in order to reconcile decisions with reason and justice.

We keep thinking of the statement of

18. The quotation from 16 C.J., p. 566 is now found in C.J.S., Vol. 22, § 649, p. 993, under the general subject of Criminal Law. The quotation from 28 R.C.L. is now found in 58 Am.Jur., p. 57, § 61, under the general subject of Witnesses.

19. The Texas, Cincinnati and Washington Law Reviews have each considered this case, and have come to the conclusion that it is wrong. See Texas L.Rev. 463 (1941); 15 Cincinnati L.Rev. 344 (1941); 26 Wash.L.Rev. 435 (1941).

Justice Holmes in the Holt case [218 U.S. 245, 31 S.Ct. 6], where he said, in part:

"But the prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof. * * *"

Justice Holmes' statement in principle is obviously the Wigmore rule approved by this court in Ricketts v. State, supra, and in view of the historical background of the self-incrimination provision of our constitution, we find no compelling reasons to justify the enlargement of this clause to cover "real" or "physical" evidence more than it has already been enlarged by Ward v. State, supra, where we held that an accused on cross-examination could not be required to demonstrate the fit of a coat. That case could have been reversed by reason of the misconduct of the county attorney in his remarks to the jury at the time defendant was required to try on the coat. It was emphasized in the Ward opinion that:

"*A clear distinction should be made between the defendant as such and between the defendant as a witness. The prohibition was intended for the protection of witnesses,* and as such it should receive a more liberal construction in favor of witnesses." (Emphasis now supplied.) [27 Okl.Cr. 362, 228 P. 500.]

In the within case the defendant was under arrest at the time she was required to perform the manual tests now complained of and to blow in the balloon for a Harger breath test for alcoholic content of the blood. In view of the fact that in this jurisdiction evidence obtained by illegal search and seizure may be suppressed on timely motion [20] it would make a material difference here if the evidence in question was so obtained. But as we said in Keith v. State, 1925, 30 Okl.Cr. 168, 172, 235 P. 631, 632:

"A person lawfully arrested may as an incident thereto be searched and articles found in his possession which are the subject of crime, or the means of committing it, or which may be of use as evidence at the trial, or which may be used in committing violence or in effecting an escape, may be seized."

We have determined that the physical or real evidence in question and obtained by the officers was in effect by coercion, but it should be emphasized that no physical force was used, or threats made, nor was brutality involved so as to bring the case within the prohibition of Rochin v. People of California, supra. And as said in Davis v. State, Md., supra, we think there is no substantial difference between obtaining a specimen of blood or breath from an accused, under ordinary circumstances, and obtaining fingerprints or physical property, the possession of which is a pertinent issue in the charge against him.

Herein, considering the evidence at trial, it was the officers' opinion, by reason of the manner in which defendant operated her motor vehicle in violation of traffic regulations, that she was not in a normal condition, and was subject to arrest, and on talking with her this conclusion was further confirmed. Still, there are many physical ailments that might account for the conduct of the defendant, a common example being a diabetic attack, so that up to this point, and in many cases, a test for the alcoholic content of the blood of the accused, if any, might result in positive evidence favorable

20. Gore v. State, 1923, 24 Okl.Cr. 394, 218 P. 545; 24 A.L.R. 1421; Brinegar v. State, 97 Okl.Cr. 299, 262 P.2d 464. Many states hold to the contrary, and in Oklahoma, if the objection is not properly raised, it will be held to have been waived. Boyd v. State, Okl.Cr., 290 P. 2d 160.

to such accused.[21] But here defendant admitted that she had drunk four cans of 3.2 beer over a period of four hours, which normally might not account for her condition. But there was a one-fifth gallon bottle of wine about three-fourths empty found in the back seat of the car, as well as some unopened cans of beer. Defendant denied having drunk the wine, but thought it had been left in her car by her nephew, who had used the car.[22]

It was the duty of the officers to obtain all evidence to support the charge contemplated: that of driving while under the influence of intoxicating liquor. It was the duty of the arresting officer, and the other officers, to seek the truth, whether favorable to the State or to the accused. The tests that defendant was required to participate in, under the facts, were reasonable, and we conclude that it is not the purpose of the amendment against self-incrimination to allow the destruction or passing over of all evidence of physical facts showing who and in what condition the defendant was following a lawful arrest. And as

previously indicated, we do not understand Rochin v. People of California, supra, to in any way hold adversely to this conclusion, for as said in the majority opinion:

"In deciding this case we do not heedlessly bring into question decisions in many States dealing with essentially different, even if related, problems. We therefore put to one side cases which have arisen in the State courts through use of modern methods and devices for discovering wrongdoers and bringing them to book. It does not fairly represent these decisions to suggest that they legalize force so brutal and so offensive to human dignity in securing evidence from a suspect as is revealed by this record. * * *" [342 U.S. 165, 72 S.Ct. 210.]

We do not believe that a fetish should be made of Art. II § 21 of the Oklahoma Constitution, the self-incrimination provision, to protect enemies of society, and the drunken driver seems to be precisely that.[23]

Proceeding now to the final proposition, the defendant urges that "the Court erred

21. See Chemical Tests for Alcohol in Traffic Enforcement, by Glenn C. Forrester, Ph.D., Chas. C. Thomas, publisher, Springfield, Ill. It is pointed out that individuals are subject to symptoms indicative of having partaken of alcoholic beverages, but where such on proper test would not prove true. It is said, for instance, that odor of liquor on the breath is a very unfair test. It is stated that intoxication resulting from drinking pure alcohol and water frequently produces a scarcely detectable odor. See also People v. Bobczyk, 343 Ill.App. 504, 99 N.E.2d 567, 570.

22. From a study of many reported cases and Journals involving the subject of drunk driving, it seems to be generally agreed that it is the exhilarated person, who may not be so under the influence of alcohol as to be socially unacceptable, who presents an acute problem. It is developed that persons in this condition rarely correctly appraise their capabilities. At any rate, if they do, are not properly concerned with the safety of themselves and the travelling public. They take chances which would be unthinkable in more prudent moments—

they let the other driver get out of the way, and on accusation seek to deny alcoholic intoxication in any degree, though some may admit "one or two beers", or "one or two cocktails."

23. See footnote 21. Statistical studies show that there were 33,700 traffic deaths and 1,200,000 persons injured in 1946, with the finger pointed at the drinking driver as being involved in something like 50% of them. According to figures announced by the National Safety Council, 425 N. Michigan Ave., Chicago, in 1955 a total of 38,300 persons were killed on the highways of the United States, and 1,350,000 injured, and the cost of such accidents was $4,500,000,000. According to a report of the Oklahoma Highway Commission, for 1955 there were 595 deaths on our highways and 12,720 persons were injured. Alcohol was involved in 487 of the fatal accidents in which 595 persons were killed. In late November, 1956 there have already been over 600 persons killed on the highways of Oklahoma. There has not been yet published the number that were under the influence of alcohol.

in permitting Officer Al Haddock to testify as an expert witness about the operation of the drunkometer machine, and the results of the test he gave the defendant."

No complaint is made as to the efficiency of the Harger drunkometer for determining the amount of alcohol in the blood of an accused. That question was settled in this jurisdiction in the case of Toms v. State, supra, 95 Okl.Cr. 60, 239 P.2d 812. See also Bryant v. State, Okl. Cr., Oct. 1956, 302 P.2d 787. The objection is that the police officer should not have been allowed to testify as to the blood alcohol content of the breath as shown on the drunkometer or on a chart, which corresponded to a reading on the same instrument as to the amount of water displaced by the breath at the moment the chemicals (1 cc of potassium permanganate, and 10 cc of sulphuric acid) through which the breath was passing from a balloon that had been blown up by the accused, changed from a purple to a whitish shade. It is argued that the police in addition to the color-change test, should also have attached to the drunkometer two tubes of chemicals that could have been used, if shown to have been properly prepared, and through which the breath would have passed, and then have had the same analyzed by a competent chemist, who could then have testified upon qualification, as an expert. He complains that the Tulsa Police Department failed to have a qualified chemist on its staff. This complaint is not without merit, considering the gravity of the traffic problem, but our task is to determine whether or not the police officer was competent to give the Harger Color-change test which showed a reading of 0.26 per cent concentration of alcohol in defendant's blood. It is counsel's theory that the police officer could make and testify to the test up to the point of water displacement by the breath, but could testify no further as to the results, unless he could qualify as being able to explain the relationship between the alcohol in the breath translated to that in the blood, and be able to work the mathematical formula. The police officer could not do that. To do that, the expert would not only have to qualify as a chemist, but be a mathematician in practice.[24]

The question is, if the officer was competent to conduct the test so as to obtain the two readings on the gasometer, and being the amount of water displaced by the breath and a corresponding reading of the alcoholic concentration in the blood, could he testify as to such readings, although he did not understand and could not work the formula by which the machine produced the readings?

There was ample evidence from Officer Al Haddock and from Capt. Hill of the Tulsa Police Department to show Haddock's competence to conduct the test, but he did not attempt to qualify as an expert in chemistry so that he could explain the formula. He did not attempt to testify as to the meaning of the readings or give an expert opinion as to the effect of alcohol on the human system. The question resolves itself into simply determining whether or not reading from

24. See instructions with each Harger drunkometer. The object is this: The chemicals through which the breath passes go through a color change at the moment .169 of a milligram of alcohol is caught by the sulphuric acid. The amount of breath which contains .169 mg. of alcohol varies according to the alcohol concentration in the breath, and therefore indirectly, in the blood. The gasometer method of measuring as involved: Water is displaced, measuring the volume of breath containing .169 mg. of alcohol (end point). Then the amount of alcohol in 3200 mi. of ordinary breath, the equivalent of 1 mi. of blood, can be computed, as follows:

$$\frac{.169 \text{ Mg. alcohol}}{\text{vol. of breath used}} = \frac{\times}{3200 \text{ mi. ordinary breath}}$$
$$\times = \text{blood alcohol.}$$

The actual computation is unnecessary as the scale on the gasometer cylinder gives the answer.

the gasometer cylinder of the drunkometer constitutes hearsay where the person conducting the test and taking the readings fails to qualify as an expert in chemistry and be able to independently work out the formula involved. Our attention is called to our case of Riddle v. State, Okl. Cr., 288 P.2d 761, 764, citing Hill v. State, 158 Tex.Cr.R. 313, 256 S.W.2d 93, 96, where it was said that for the results of the test to be admissible the proof should show:

" '1. Proof that the chemicals were compounded to the proper percentage for use in the machine.

" '2. Proof that the operator and the machine were under the periodic supervision of one who has an understanding of the scientific theory of the machine.

" '3. Proof by a witness who was qualified to calculate and translate the reading of the machine into the percentage of alcohol in the blood; that is, one who could eliminate the hearsay evidence mentioned earlier.' "

We conclude that the evidence in this case met the first two requirements for the color-change test (where the dehydrite tube and ascarite tube would be used the chemist preparing the tubes would have to testify as to proper compounding, weighing, etc.).

Sgt. Haddock did not meet the third requirement, but that link was supplied by the testimony of Dr. Van Pelt, who qualified as an expert. He not only understood the use of the drunkometer, but qualified as competent to give an opinion as to the effect of alcohol on the human body. He testified that the medical profession, as did he, concluded that where a person was shown to have a concentration of 0.15 per cent alcohol in their blood, that they would definitely be under the influence of alcohol. In other words, they would be considered intoxicated.

In the Toms case it was pointed out that the Harger Breathometer was recognized as a proper test by different medical schools and colleges, by the American Medical Association, the Commissioner of National Safety, and the Federal Bureau of Investigation. It is noted from a bulletin, "Test Talk" by the National Safety Council, Chicago, Vol. VIII, No. 9, dated October, 1956, that 588 cities of over ten thousand population in the United States now use chemical tests for intoxication and that chemical test laws modeled after the Uniform Vehicle Code have been adopted in 23 continental states and the commonwealth of Puerto Rico. The most common devices are the Drunkometer, Intoximeter and Alcometer, though a new device, the Breathalyzer was demonstrated under sponsorship of representatives of the American Medical Association and American Bar Association at the American Bar Association annual convention at Dallas in August, 1956.

It must be recognized in giving the tests for the alcoholic content of the blood that the color-change test of both the Harger drunkometer, and the intoximeter (Forrester) used by the Highway Patrol and mentioned by the defendant, require no knowledge of chemistry or mathematics, nor is it necessary to understand the meaning of the operations in order to obtain the percentage blood alcohol reading. But it does require a chemist to make the further tests where the dehydrite tube and ascarite tubes are used in case of the drunkometer and magnesium perchlorate tube and the ascarite tube in case of the intoximeter.[25] And it does require an expert witness to testify as to the meaning of the readings. That was done in this case.

Certainly the drunkometer could not be cross-examined as to the reliability of the reading, but there was ample opportunity to cross-examine the operator as to whether an unused balloon was used for trapping the breath, whether the pipette for

25. See footnote 21.

measuring the potassium permanganate and the separate one for measuring the sulphuric acid were clean, and whether the rubber tubes connecting the various parts were leak-proof, etc. It was only necessary to determine that the machine was in working order and that a careful reading was made and that the exact amount of chemicals were measured out, and that the air was shut off at the instant the color change took place; and of course after a course of instruction, the operator was qualified to make the test in question. All this was done.

■ One is allowed to testify as to the time of day by having looked at a watch or clock; the temperature by the reading of a thermometer; the speed of an automobile by reference to the speedometer; the operation and results from adding a column of figures on an adding machine, and the distance between points within Oklahoma by having referred to an official map of the State. We conclude that Sgt. Haddock was competent to give the readings he found on the gasometer cylinder, or on the accompanying chart of the drunkometer. It was necessary for an expert to interpret the meaning of the readings, and that was done.

In this case we are not called upon to say whether the drunkometer test such as was made, standing alone, would be conclusive, for there was evidence, not only from the arresting officer that from the defendant's described conduct it was his conclusion that she was intoxicated at the time of her arrest, such was the conclusion of the police jail matron from described conduct, and the conclusion of Officer Haddock who at the city jail conducted the manual tests. He said that defendant staggered off the 14 foot white line all four times she tried to walk it, and that she had great difficulty in picking up three coins dropped on the floor.

He gave her the Romberg test where she would stand erect and close her eyes. Said witness: "When she closed her eyes and attempted to stand steady she swayed awfully bad. She in fact almost fell on her face until she opened her eyes and got her balance."

■ So where there is evidence other than that of the expert witness, no distinction is made as to weight to be given the same, the jury or trial court determines that. Whatever claims the medical profession may make for the test, no evidence is by law made conclusive and unanswerable, unless so declared by the code. The law makes no distinction between expert testimony and evidence of other character. When there is a conflict between scientific testimony and testimony as to facts, the jury or trial court must determine the relative weight of the evidence. See Toms v. State, supra; People v. Tucker, 1948, 88 Cal.App.2d 333, 198 P.2d 941, 944.

■ But by reason of the fact that we do not have a statute in Oklahoma covering the matter, it is necessary to summon an expert witness to testify to the scientific basis for the percentages incorporated into the scales or chart involved in the breath test for alcohol. See Toms v. State, supra, at page 817 of 239 P.2d for a chart showing different concentrations of alcohol in the blood indicative of different states of intoxication, or nonintoxication.

Anything in the case of Riddle v. State, supra, contrary to the conclusions expressed herein are expressly overruled.

■ There was ample evidence to support the verdict of the jury. This court does not weigh the evidence. Ryan v. State, 97 Okl.Cr. 119, 258 P.2d 1208.

For the reasons given, the verdict and judgment must be, and are affirmed.

JONES, P. J., and BRETT, J., concur.